652 A.2d 1350

**In re Daniel Joseph FIORI, an Adjudged Incompetent.**

**Appeal of PENNSYLVANIA ATTORNEY GENERAL.**

Superior Court of Pennsylvania.

Argued Sept. 30, 1994.

Filed Jan. 17, 1995.

612

Sue A. Unger, Philadelphia, for appellant.

John N. Schaeffer, Doylestown, for Rosemary Sherman, participating party.

Robert B. Hoffman, Harrisburg, for amicus curiae PA Med. Soc.

Alan Meisel, Pittsburgh, for Amicus Curiae, University of Pittsburgh Med. Ctr.

Before ROWLEY, President Judge, and CAVANAUGH, WIEAND, McEWEN, CIRILLO, OLSZEWSKI, BECK, KELLY and POPOVICH, JJ.

BECK, Judge.

This appeal requires that we decide whether life sustaining treatment in the form of a gastrostomy tube should be removed from a patient who for almost twenty years has been in a persistent vegetative state with no cognitive powers and no chance of recovery. We agree with the trial court that the life

sustaining treatment should be terminated and, therefore, affirm the trial court.

We conclude that consent of a close family member along with approval of two qualified physicians is sufficient to terminate life sustaining treatment to a person in a long-term persistent vegetative state without court involvement. We further emphasize that our decision today is limited to the category of cases where the patient is in a persistent vegetative state with no cognitive power and no chance of recovery where such patient has not previously expressed a view as to whether life sustaining treatment should be terminated.[1]

The facts giving rise to this case as well as all such termination of life sustaining treatment cases are tragic. Daniel Joseph Fiori, the patient whose future is at issue, is 43 years old. As a result of two successive incidents, one in 1972 when Mr. Fiori was twenty years old and one in 1976, Mr. Fiori was rendered comatose. Since 1976, Mr. Fiori has been in a neurologic condition known as a persistent vegetative state. In *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), the United States Supreme Court provided the following well-accepted description of a persistent vegetative state:

Vegetative state describes a body which is functioning entirely in terms of its internal controls. It maintains temperature. It maintains heart beat and pulmonary ventilation. It maintains digestive activity. It maintains reflex activity of muscles and nerves for low level conditioned responses. But there is no behavioral evidence of either self-awareness or awareness of the surroundings in a learned manner.

*Id.* at 267, n. 1, 110 S.Ct. at 2846, n. 1.

In other words, although Mr. Fiori's body is alive and may well stay alive for years, his cognitive function has been so

1. Despite the fact that court involvement is not required in this category of case, we realize as a practical matter uncertainty may arise and the parties will seek court guidance. In such an event, we endorse the standard set forth in Judge Wieand's Concurring Opinion which provides a common sense and compassionate standard for the trial court to follow.

thoroughly destroyed that he does not know he is alive. He feels no pain and he feels no pleasure. Thus, although he realizes no pain from the presence of the gastrostomy tube, he would equally realize no pain if it were withdrawn. There is no dispute in this case that this is Mr. Fiori's medical condition, and there is also no dispute that his condition will never improve.

Mr. Fiori has for years been a patient at the Mayo Nursing and Convalescent Center in Philadelphia and has received excellent care. Since he has no capacity for voluntary muscular movement, including swallowing, he is provided his medications, fluids and nutrition through a tube surgically inserted in his stomach called a gastrostomy tube. His mother, Rosemarie Sherman, who was appointed the guardian of Mr. Fiori's person by court order entered in 1980, has been devoted to him throughout his ordeal. She visits him several times every day, supervises his nursing care and personally provides him with the supplies necessary to insure that his care is the very best.

In February 1992, Mrs. Sherman determined that her son's treatment, i.e. the gastrostomy tube, should be terminated. The nursing home refused to comply with her request without a court order and she filed a petition in the Court of Common Pleas for Bucks County requesting an order directing the nursing home to terminate the treatment. The Attorney General appeared in the proceeding and, pursuant to its request, an independent medical expert was appointed to examine Mr. Fiori. The trial court took testimony from Mrs. Sherman and from a neurologist who had examined Mr. Fiori. The court also considered the report of the independent medical expert. The evidence revealed that prior to Mr. Fiori's injuries he had never specifically commented on how he would wish to be treated if he were in a persistent vegetative state or otherwise rendered incompetent. However, his mother testified that based on her understanding of her son and his attitude toward life while he was competent her son would no longer wish to be kept alive in his present condition.

The trial court found that it had insufficient evidence to determine what Mr. Fiori's own decision concerning his treatment would be if he were competent. Thus, the court applied what it termed an "objective standard," which it described as follows:

> If the exercise of the right [to self-determination] is to be maintained where no expression has been made by an incompetent patient as to treatment, it must take place within the context of an analysis which seeks to implement what is in that person's best interests by reference to objective societally shared criteria.... '[I]n assessing whether a procedure or course of treatment would be in a patient's best interests, the decision maker must taken into account such factors as the relief of suffering, the preservation or restoration of functioning, and the quality as well as extent of life sustained.'

Trial Court Op. at 8 (quoting *Foody v. Manchester Memorial Hospital,* 40 Conn.Sup. 127, 482 A.2d 713, 721 (Ct.1984).

Finding this standard satisfied, the trial court entered a Final Decree authorizing the discontinuance of the gastrostomy tube and all other life sustaining procedures.

The Attorney General appealed, and raises the following issues for our review:[2]

1. Whether the orphans' court erred by failing to appoint a guardian ad litem to represent a comatose patient's interest in a proceeding to determine whether life support should be withdrawn?

2. Whether the orphans' court erred by authorizing a process which would result in the patient's death without requiring clear and convincing evidence that he would wish to have life sustaining medical treatment withdrawn?

---

2. Amicus curiae briefs were filed by The Pennsylvania Medical Society, The Pennsylvania Catholic Conference, The University of Pittsburgh Center for Medical Ethics, The University of Pennsylvania Medical Center, the Hospital Association of Pennsylvania and the Ethics and Advocacy Task Force of the Nursing Home Action Group. In cases such as this, which raise issues of broad social concern and implicate far more than purely legal considerations, the submissions of such amici are particularly helpful.

We need not separately address the Attorney General's first issue. Since we ultimately hold that no legal proceedings are necessary in the great majority of cases involving the termination of life sustaining treatment to persons in Mr. Fiori's condition, and that no such proceeding was actually necessary in this case, obviously we see no need for the appointment of a guardian ad litem.

The Attorney General's basic legal position on the issue presented is that life sustaining treatment should not be terminated in the case of Mr. Fiori or any other person without clear and convincing evidence that termination of treatment would be the choice that person would make if he or she were competent. Moreover, the Attorney General would have this court require that the only evidence of the patient's wishes that will meet this evidentiary standard is a prior express statement by the patient. Finally, the Attorney General would require that a court proceeding be conducted in every such case so that the determination of whether the above-stated test had been met could be made by the court.

We cannot adopt the Attorney General's suggested approach to the crucially important issue presented by this case. At the outset, we note that the Attorney General frames the issue far too broadly. The discussion of this case should be limited to its facts, i.e., what standard should be applied in the case of a once competent adult who is now in a persistent vegetative state and who, when competent, had not directly expressed a view on whether he would want life sustaining treatment to be terminated under these circumstances, but who has a close relative who believes he would want his treatment terminated. The development of the law as to other types of cases should wait until another day. These cases arise from greatly differing factual scenarios. Termination of treatment issues arise in cases involving never competent adults, once competent and now incompetent and terminally ill adults, never competent children who have been severely impaired since birth, and adults like Mr. Fiori who, although once competent, no longer are and who, while not terminally ill, are in a persistent vegetative state. As to life

sustaining measures, in some instances the patient will have clearly articulated his or her view; in others the patient will have expressed a view, but it has not been clearly articulated; and, in others, the patient will not have expressed any view. It is both inappropriate and inadvisable to attempt to deal with each of these possible scenarios outside of the specific matrix of facts and considerations each such case might present. *See, e.g., Matter of Peter,* 108 N.J. 365, 529 A.2d 419 (1987) (setting standards for terminating treatment of elderly nursing home patients in a persistent vegetative state and distinguishing such cases from those involving other types of patients in distinct medical situations); *Matter of Conroy,* 98 N.J. 321, 486 A.2d 1209 (1985) (distinguishing standards applicable to terminally ill elderly patient from that of younger persistent vegetative state patient).

The issue we are called upon to decide relates only to the termination of life sustaining treatment to a once competent, now incompetent, adult in a persistent vegetative state who has not clearly expressed a view on whether he would want life sustaining measures to continue, but whose close relative believes that he would now want his treatment terminated.

We begin our analysis of the issue with an examination of the underlying right we are called upon to protect—the right to self-determination in regard to the acceptance or rejection of life sustaining medical treatment. Although many different grounds for the existence of a right to self-determination may be asserted, there can be no doubt that such a right does exist. *See In re Torres,* 357 N.W.2d 332 (Minn. 1984) (citing both constitutional and common law grounds for existence of right to self-determination); *Foody v. Manchester Memorial Hospital,* 40 Conn.Sup. 127, 482 A.2d 713 (1984) (same). Careful review of the Supreme Court's recent *Cruzan* decision reveals that eight of the nine justices found a federal Due Process liberty interest in refusing unwanted medical treatment. *Cruzan,* 497 U.S. at 278, 110 S.Ct. at 2851; at 287, 110 S.Ct. at 2856 (O'Connor, J., concurring); at 302, 110 S.Ct. at 2863–64 (Brennan, Marshall and Blackmun, JJ., dissenting); at 331, 110 S.Ct. at 2879 (Stevens, J., dissenting). *See also*

*Mack v. Mack,* 329 Md. 188, 618 A.2d 744, 755–56 (1993) (noting Supreme Court justices' apparent acceptance of liberty interest in rejecting treatment).

Our own Supreme Court has recently commented on the constitutional right to privacy, specifically including the right to make important personal decisions, as follows:

> There is no longer any question that the United States Constitution provides protection for an individual's right of privacy. At least two distinct types of privacy interests have been recognized. "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." This Court has recognized these same interests under the Pennsylvania Constitution.
>
> . . . .
>
> Under the Pennsylvania Constitution, the right to be let alone has also been recognized. Similarly in Pennsylvania, this right is not absolute. However, Pennsylvania has not adopted a flexible approach in its state constitutional privacy analysis. Under the law of this Commonwealth only a compelling state interest will override one's privacy rights.

*Stenger v. Lehigh Valley Hospital Center,* 530 Pa. 426, 434, 437, 609 A.2d 796, 800, 802 (1992) (citations omitted). *See also McCusker v. Workmen's Compensation Appeal Board,* 536 Pa. 380, 639 A.2d 776 (1994) ("[c]entral to this aspect of the privacy right is the intrusion of government into the sphere of marriage and family life by prohibiting or criminalizing certain kinds of decisions").[3]

The right to control and refuse medical treatment is also founded on the common law of this Commonwealth, which has long provided that other than in an emergency, medical treatment may not be given without the informed consent of the

---

3. The right to privacy is founded upon both state and federal constitutional guarantees. For purposes of the Pennsylvania Constitution the right to privacy is grounded in Article I, sections 1 & 8. We find that the right to self-determination as to decisions concerning medical treatment emanates from that aspect of the privacy right which guarantees Pennsylvania citizens the right to make important personal decisions.

patient. *See Moure v. Raeuchle,* 529 Pa. 394, 404, 604 A.2d 1003, 1008 (1992) (citing, *inter alia, Smith v. Yohe,* 412 Pa. 94, 194 A.2d 167 (1963); *Gray v. Grunnagle,* 423 Pa. 144, 223 A.2d 663 (1966)). Provision of medical treatment that exceeds the scope of the patient's consent may be actionable in tort. *Id.* The physician may not "touch" the patient without his knowledgeable consent. This reflects the common law's rationale that the patient is free to accept or reject treatment.

■ Clearly, however, the right to self-determination as to one's own medical treatment is not absolute. The state has interests that are implicated in cases involving the termination of life sustaining treatment. These interests have classically been identified as consisting of the state's interests in the preservation of life, the prevention of suicide, the protection of third parties and the integrity of the medical profession. *See, e.g., Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977); *In re Torres,* 357 N.W.2d 332 (Minn.1984); *In re Colyer,* 99 Wash.2d 114, 660 P.2d 738 (1983). As the trial court aptly found, in this case the state's interests in the prevention of suicide, the protection of third parties, and medical ethics are not implicated. Suicide is the volitional taking of one's own life, an act of which Mr. Fiori is not even capable. There are no third parties in need of protection as Mr. Fiori has no dependents. Lastly, the integrity of the medical profession is not in question. As the amicus brief filed by the Pennsylvania Medical Society indicates, the termination of Mr. Fiori's treatment presents no medical ethical problems. All doctors involved in evaluating Mr. Fiori concur that he is in a persistent vegetative state from which he will not recover. In such a case, amicus states:

> ... medical ethical principles support the withdrawal of life sustaining treatment, including the provision of nutrition and fluids, when, as here, there is no hope of recovery and the decision is made by an obviously concerned and well-informed surrogate decisionmaker exercising a choice based on the patient's preferences when they can be discerned or, if they cannot be determined, based on the patient's best interests.

Brief of The Pennsylvania Medical Society at p. 16. *See also, e.g., In re Guardianship of Grant,* 109 Wash.2d 545, 747 P.2d 445 (1987) (citing AMA Council on Ethical and Judicial Affairs, "Withholding or Withdrawing Life–Prolonging Medical Treatment," Mar. 15, 1986) (no medical ethical barrier to discontinuing life sustaining treatment to indisputably irreversibly comatose patient where all responsible for care of patient concur).

Thus, the only state interest with any pertinence to our inquiry is the general interest in the preservation of life. Although there is no doubt as to the validity of this interest, the real question is, what is the force or import of this interest in comparison to the right to self-determination?

It has generally been held, and appropriately so, that the state's interest in the preservation of life does not outweigh a *competent* individual's right to self-determination. As the New Jersey Supreme Court has stated:

> In cases that do not involve the protection of the actual or potential life of someone other than the decisionmaker, the state's indirect and abstract interest in preserving the life of the competent patient generally gives way to the patient's much stronger personal interest in directing the course of his own life.
>
> . . . .
>
> On balance, the right to self-determination ordinarily outweighs any countervailing state interests, and competent persons generally are permitted to refuse medical treatment, even at the risk of death.

*Conroy,* 98 N.J. at 350, 486 A.2d at 1223, 1225. *Cf. In re Estate of Dorone,* 517 Pa. 3, 534 A.2d 452 (1987) (blood transfusion given to patient in *emergency* life-threatening situation despite his previous declaration of religious objection to transfusions).

However, as the *Conroy* court continued, the situation changes when the right to self-determination of an *incompetent* person is at issue:

> More difficult questions arise in the context of patients who are incompetent to make particular treatment decisions

for themselves. Such patients are unable to exercise directly their own right to accept or refuse medical treatment. In attempting to exercise that right on their behalf, substitute decisionmakers must seek to respect simultaneously both aspects of the patient's right to self-determination—the right to live, and the right, in some cases, to die of natural causes without medical intervention.

*Id.* at 356, 486 A.2d at 1227.

In every case where a court has been asked to permit the withdrawal of life sustaining treatment from a patient in a persistent vegetative state, the court has held that if it can be definitely determined that it would have been the patient's desire not to receive such treatment, then the patient's right to self-determination outweighs any state interest and the treatment may be withdrawn. *See, e.g., Mack v. Mack,* 329 Md. 188, 618 A.2d 744 (1993); *Rasmussen by Mitchell v. Fleming,* 154 Ariz. 207, 741 P.2d 674 (1987); *McConnell v. Beverly Enterprises—Connecticut, Inc.,* 209 Conn. 692, 553 A.2d 596 (1989); *In re Guardianship of Browning,* 543 So.2d 258 (Fla.Dist.Ct.App.1989), *aff'd,* 568 So.2d 4 (Fla.1990); *In re Estate of Longeway,* 133 Ill.2d 33, 139 Ill.Dec. 780, 549 N.E.2d 292 (1989). Thus, the right to self-determination has uniformly been held to survive incompetency and, if the patient's own desires can be ascertained, the right outweighs any state interest, including the preservation of life.

However, the difficult question arises as to what to do in a case like this, and like so many others, where the patient while competent simply had never expressed a clear and specific preference as to whether he or she would wish to be kept alive for decades in a totally non-sapient state. With rare exceptions, courts confronted with such a situation have stated that under certain circumstances they would permit the decision as to whether life sustaining treatment should be terminated to be made through the exercise of "substituted judgment" by the patient's family or guardian.[4] *Matter of Jobes,* 108 N.J.

4. Two such exceptions are the courts of New York and Missouri, both of which appear not to permit the termination of life sustaining treatment except where it can be shown by clear and convincing evidence that

394, 529 A.2d 434 (1987); *Estate of Longeway*, 133 Ill.2d 33, 139 Ill.Dec. 780, 549 N.E.2d 292 (1989); *In re Rosebush*, 195 Mich.App. 675, 491 N.W.2d 633 (1992); *Conservatorship of Torres*, 357 N.W.2d 332 (Minn.1984). The Supreme Court of New Jersey has perhaps most eloquently and clearly stated how the judgment of the surrogate decisionmaker is to be rendered, as follows:

> where an incompetent's wishes are not clearly expressed, a surrogate decisionmaker considers the patient's personal value system for guidance. The surrogate considers the patient's prior statements about and reactions to medical issues, all the facets of the patient's personality that the surrogate is familiar with—with, of course, particular reference to his or her relevant philosophical, theological, and

such would have been the desire of the patient if he or she were competent. *See Cruzan v. Harmon*, 760 S.W.2d 408 (Mo.1988), *aff'd sub nom. Cruzan v. Missouri Dept. of Health*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990); *In re O'Connor*, 72 N.Y.2d 517, 531 N.E.2d 607, 534 N.Y.S.2d 886 (1988).

In reviewing the decision of the Missouri Supreme Court in *Cruzan*, the United States Supreme Court held that a state may constitutionally impose a requirement of clear and convincing evidence of the patient's own previously expressed desire as to life sustaining treatment. However, the court did not hold that such a requirement was constitutionally mandated. *Cruzan*, 497 U.S. at 292, 110 S.Ct. at 2858–59. As Justice O'Connor opined in her concurring opinion in *Cruzan:*

> Today's decision .... does not preclude a future determination that the Constitution requires the States to implement the decisions of a patient's duly appointed surrogate. Nor does it prevent States from developing other approaches for protecting an incompetent individual's liberty interest in refusing treatment.... Today we decide only that one State's practice does not violate the Constitution; the more challenging task of crafting appropriate procedures for safeguarding incompetents' liberty interests is entrusted to the 'laboratory' of the States.... in the first instance.

*Id.*

Interestingly, in a more recently decided case, the Missouri Court of Appeals appeared to limit the *Cruzan* holding to a case involving the withholding of artificial hydration and nutrition. In *In re Warren*, 858 S.W.2d 263 (Mo.Ct.App.1993), the Court permitted the use of a substituted judgment or best interests standard in a case involving a severely ill elderly patient. Employing this standard, the court permitted the entry of a "Do Not Resuscitate" order on the patient's chart, finding that the patient would likely not survive resuscitation efforts in the event of cardiac arrest. *Id.* at 264–66.

ethical values—in order to extrapolate what course of medical treatment the patient would choose.

*Matter of Jobes,* 108 N.J. at 415, 529 A.2d at 444 (footnote omitted).

In addition, many of the courts considering this question have found that there is no need for a court to intervene in this decisionmaking process unless there is disagreement between the interested parties, who are usually identified as the medical professionals involved in treating and evaluating the patient and the patient's family or guardian. *See, e.g., Jobes, supra; Rosebush, supra.*

In contrast, the Attorney General would require judicial intervention in every case and would impose a standard of decision requiring clear and convincing evidence of a prior express statement by the patient that he or she would want treatment terminated under the circumstances presented. While the Attorney General purports to provide maximum protection to the patient's right to self-determination by imposing this standard, in fact adoption of such a standard will not achieve that objective. It must be recalled that under Pennsylvania law, clear and convincing evidence has been defined as evidence that is virtually indisputable. *See* Leonard Packel and Anne Poulin, Pennsylvania Evidence, § 303.2 (1987). If, for example, we were to apply the clear and convincing evidence test to a case like the instant one, it would be impossible for a court to approve the termination of life sustaining treatment to Mr. Fiori, even if those closest to him were convinced that is what he would want. Unless they could produce a written statement, or testify to an oral one, in which Mr. Fiori had said, "This is what I want," nothing could be done. His right to self-determination would not be protected, but rather might well be negated.

Furthermore, the time of the decision to withdraw life sustaining treatment is one fraught with pain and anxiety for those who love the patient. To compound the suffering with a court proceeding is insensitive and unnecessary. What special knowledge or insight does the court have in these painful and

intimate situations? Is not the patient sufficiently protected by the surrogate's decision approved by two doctors? Unlike the Attorney General we find state involvement through the courts overly intrusive and violative of the individual's right to privacy. The patient's rights are adequately represented by the surrogate, in this case, the mother. She is clearly qualified to exercise substituted judgment and can express what Mr. Fiori would want. His mother, who has given her son devoted care for almost two decades, who has taken all those years to consider what should be done, who has consulted her religious advisors and her own heart, is here to tell us that at this point in time, her son would say "enough is enough".[5] All the doctors who have evaluated Mr. Fiori, including the independent physicians appointed by the trial court, agree as to his irreversible persistent vegetative state. No one disputes these facts. All the pertinent questions have been answered. The treatment should be terminated, and not because a court says so, but because Mr. Fiori's mother is able to express what her son would have wanted and two physicians attest to the fact that for the remainder of his life he would be in a persistent vegetative state.

In reaching this conclusion, we have relied heavily on the guidance provided by the opinions of the courts of many of our sister jurisdictions who have reached the same conclusion. In particular, we have relied on the carefully crafted opinion of the Supreme Court of New Jersey in *Matter of Jobes, supra.* Justice Garibaldi, writing for the *Jobes* majority, held that in the case of a once competent adult patient in a persistent vegetative state who had never expressed a specific view as to life sustaining treatment, the treatment could nevertheless be terminated under certain circumstances and in accordance with certain procedures.

First, Justice Garibaldi found that while the state has an undeniable interest in the preservation of life,

5. The Attorney General suggests that in fact Mrs. Sherman is an inappropriate decisionmaker because she may be motivated by a desire for personal financial gain. We, on the other hand, have no such concern because the trial court, who saw and heard Mrs. Sherman testify, adjudged her to be entirely sincere and acting in good faith.

... those interests weaken and the individual's right to privacy becomes stronger "as the degree of bodily invasion [effected by the medical treatment at issue] increases and the prognosis [for recovery to a cognitive, sapient state] dims."

... [It is] difficult to conceive of a case in which the State could have an interest strong enough to subordinate a patient's right to choose not to be sustained in a persistent vegetative state."

*Matter of Jobes,* 108 N.J. at 413–14, 529 A.2d at 444 (citations omitted) (quoting *Matter of Peter,* 108 N.J. 365, 380, 529 A.2d 419, 427 (1987); *In re Quinlan,* 70 N.J. 10, 41, 355 A.2d 647, *cert. denied sub nom. Garger v. N.J.,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976)).

The *Jobes* court appropriately concluded that the only way to fully effectuate the predominating right of the incompetent patient to determine his own course of treatment was to permit the exercise of substituted judgment on the patient's behalf. The substituted judgment would, of course, aim solely at determining what the patient would have chosen for himself based on prior expressions of view concerning medical issues by the patient, if any, and on the entire personality, philosophy and value system of the patient. *Id.* at 413–15, 529 A.2d at 444.

Of equal importance is the *Jobes* court's determination, with which we entirely agree, that the patient's family members, usually but not limited to the spouse, parent, adult child or sibling, are the appropriate parties to render the substituted judgment. *Id.* at 413–20, 529 A.2d at 444–47. The court so found for the following cogent reasons:

Almost invariably the patient's family has an intimate understanding of the patient's medical attitudes and general world view and therefore is in the best position to know the motives and considerations that would control the patient's medical decisions.

. . . .

Family members are best qualified to make substituted judgments for incompetent patients not only because of their peculiar grasp of the patient's approach to life, but also because of their special bonds with him or her.

. . . .

"The importance of the family in medical treatment decisions is axiomatic.

. . . .

The law has traditionally respected the private realm of family life which the state cannot enter.... We believe that this tradition of respect for and confidence in the family should ground our approach to the treatment of the sick."

*Id.* at 415–16, 529 A.2d at 445 (quoting, in part, *In re Farrell,* 108 N.J. 335, 355, 529 A.2d 404, 414 (1987)).

Finally, like the *Jobes* court, we too would require that treatment may not be terminated unless the surrogate decisionmaker has obtained written statements of two doctors qualified to evaluate the patient's condition certifying that the patient is in a persistent vegetative state without reasonable possibility of recovery. *Id.* at 420–23, 529 A.2d at 448. If the patient has an attending physician, that physician should also submit such a statement. Thus, the appropriate professionals will render the crucial decision as to the patient's medical condition.

Of course, there will be instances where there is no family member sufficiently close to the patient to render a judgment on his or her behalf, or the doctors involved in the patient's care perceive that the family members are not actually attempting to effectuate the patient's own choice, or there is a dispute among family members and no one has been designated as the decisionmaker in an advance directive. In such situations, treatment should not be terminated without the appointment of a guardian and the aid of the court.

■ If the foregoing procedures are followed, and none of the above-listed extraordinary circumstances exist, the approval of a court prior to termination of treatment is not required. In this, we merely confirm what we suspect has in fact been the practice followed by many families and doctors for years. These decisions have been made by families, in consultation with doctors and other advisors, in privacy and without governmental interference. *See In re Estate of Longeway,* 139 Ill.Dec. 780, 139 Ill.Dec. 780, 549 N.E.2d 292 (1989).

We agree with the numerous courts that have found that the judiciary simply has no role to play in a case where there is a loving family, willing and able to assess what the patient would have decided as to his or her treatment, all necessary medical confirmations are in hand, and no one rightfully interested in the patient's treatment disputes the family's decision. *See, e.g., Jobes,* 108 N.J. at 415–20, 529 A.2d at 445–47; *In re Rosebush,* 195 Mich.App. 675, 491 N.W.2d 633 (1992); *In re Guardianship of Grant,* 109 Wash.2d 545, 747 P.2d 445, 456–57 (1987). Those who disagree with this view and who favor court intervention in every case often cite the need for the court to protect the patient. Underlying this rationale is the philosophy that only courts can provide the necessary safeguards to assure protection of life. This is a narrow and unhealthy view. It violates the essential and traditional respect for the family. It is yet another expansion of the idea that courts in our society are the repository of wisdom and the only institution available to protect human life and dignity. There is an unarticulated, underlying fear that without intervention by the court and perhaps a guardian ad litem that the parent or other relative might take action to end life for personal gain. While this fear may in rare cases have some foundation, it loses its force when the consent of two physicians is a necessary requirement before life sustaining treatment is terminated.

Moreover, such fears do not justify the invasion of the state into the private realm of the family where such important personal decisions should be made. The law of this Common-

wealth has long respected the sanctity of the family and has sought to protect its privacy and preserve to it the right to govern itself as far as possible. Certainly this respect for the family should extend to the intensely private decision as to whether a family member who has been tragically reduced to a vegetative state would wish to continue to live in that state.[6]

█ Prior to concluding, we need address one further point raised by the Attorney General and certain amicus curiae. The suggestion is made that the Commonwealth's new Advance Directive for Health Care Act, 20 Pa.C.S. § 5402 et seq. (1992), and certain recent amendments to our guardianship statute lend support, if not expressly then implicitly, to the position taken by the Attorney General. We, on the other hand, find nothing in either the guardianship statute or the Advance Directive for Health Care Act (the "Act") that reasonably could be construed as dictating a result in this case or even as providing a general standard to guide our decision-making. The Act is concerned only with the establishment of standards pursuant to which competent persons may execute valid and binding advance directives stating what they wish to be done regarding their medical treatment in the event that they in the future become incompetent and are in a terminal condition or are permanently unconscious. 20 Pa.C.S. §§ 5404, 5405.

6. The dissent quite correctly points out that many of today's families are unstable. Because of this the dissent would require court intervention in every case. The majority would not. The majority is in total agreement with the dissent that where there is a question raised about the appropriateness of the relative making the substituted judgment or the motives of the relative, those cases must be adjudicated by the court. Most hospitals have ethics committees in which such questions would be addressed and the hospital itself would be in a position to seek court intervention. Of course, any of the patient's relatives and any doctor involved in the decision-making process would also be able to seek the aid of the court where necessary.

The holding of the majority does not require court intervention in the absence of such questions but does require it in those cases which are not free from doubt. The majority upholds strongly the sanctity and the privacy of the family and believes the law should cherish and safeguard family integrity. The wisdom and decency of a family faced with life and death decisions do not need to be tested in court.

In fact, we find clear indicia in the Act that the legislature intended *not* to establish standards for the termination of life sustaining treatment in any case, like the instant one, where an advance directive had not been executed by the patient. The Act provides that it "shall create no presumption concerning the intent of any person who has not executed a declaration to consent to the use or withholding of life sustaining procedures in the event of a terminal condition or a state of permanent unconsciousness." 20 Pa.C.S. § 5402(b). The Act also contains a limitation of scope provision stating that the Act "shall not impair or supersede any existing rights or responsibilities not addressed in this chapter." *Id.* at § 5412. Since the Act specifically does not address the rights of incompetent persons who never executed advance directives, presumably under section 5412 those persons' rights now are exactly what they were before the passage of the Act. It is our task in this case to state, for the first time, what those rights are.[7] *Accord DeGrella v. Elston,* 858 S.W.2d 698 (Ky.1993) (similarly construing Kentucky "living will" statute using language like that in Pennsylvania Advance Directive Act to be a non-exclusive enactment that does not dictate a result in termination of life sustaining treatment cases where patient had not executed a living will).

7. The only aspect of the Act that may be viewed as pertinent is the initial section where the legislature sets forth its general findings underlying the new statute, as follows:

> The General Assembly finds that all competent adults have a qualified right to control decisions relating to their own medical care. This right is subject to certain interests of society, such as the maintenance of ethical standards in the medical profession and the preservation and protection of human life. Modern medical technological procedures make possible the prolongation of human life beyond natural limits. The application of some procedures to an individual suffering a difficult and uncomfortable process of dying may cause loss of patient dignity and secure only continuation of a precarious and burdensome prolongation of life.

20 Pa.C.S. § 5402(a).

These findings are pertinent insofar as they confirm what we already have concluded concerning the right to self-determination of medical treatment possessed by all competent adults, the state interests in medical ethics and preservation of life, and the effect of modern medical developments on the prolongation of human life. They do not otherwise assist our decisionmaking in this case.

Reference is also made to the guardianship statute, as amended in 1992. 20 Pa.C.S. § 5501 *et seq.* The Attorney General refers to those portions of the statute relating to determinations of incapacity and appointment of guardians and appears to find support for his approach to this case in the portion of the statute that requires that "clear and convincing evidence" of incapacity be presented before a person is adjudicated incapacitated and a guardian appointed.

Having thoroughly reviewed the guardianship statute, we find that it not only does not control this case but also that it provides no real guidance on the issue presented. The fact that the guardianship statute requires clear and convincing evidence of incapacity has no relevance to the standard of proof to be employed in deciding to terminate life sustaining treatment. Moreover, there is nothing in the guardianship statute to suggest that judicial approval is necessary to terminate life sustaining treatment. In fact, those subsections that list the powers and duties that may only be specifically granted to a guardian by a court order or that may never be granted to a guardian make no reference to the termination of life sustaining treatment. 20 Pa.C.S. § 5521(d) & (f). The statute simply does not address the issue presented in this case.

The trial court correctly decided that all life sustaining treatment presently being rendered to Mr. Fiori should be terminated. The order of the trial court is affirmed.

ROWLEY, President Judge, and WIEAND, CIRILLO, OLSZEWSKI, and KELLY, JJ., join this Opinion.

WIEAND, J., files a Concurring Opinion in which ROWLEY, President Judge, joins.

McEWEN and OLSZEWSKI, JJ., each file Concurring Statements.

POPOVICH, J., files a Concurring and Dissenting Opinion.

CAVANAUGH, J., files a Dissenting Opinion.

WIEAND, Judge, concurring.

May the family of a patient, who has been in a persistent vegetative state for several years with no chance for recovery and who has not previously recited his wishes regarding the use of life sustaining medical procedures at a time when he was competent, be permitted to withdraw nutrition and hydration supplied by artificial means? I agree with the majority and join its determination that, when possible, such a decision can and should be made by a close family member and two qualified physicians without the necessity for obtaining a court order. In many instances, however, the circumstances will require that a court intervene. This was such a case. I write separately, therefore, to elucidate those considerations which should affect the decision of a trial court and the review to be conducted by an appellate court.

Daniel Joseph Fiori resides at the Mayo Nursing and Convalescent Center in Philadelphia. He became incompetent in 1971 at the age of twenty-one, when he suffered severe brain damage in a motorcycle accident. He was confined to a wheel chair and could only express himself by limited verbal sounds and facial and bodily gestures. At this time, his cognitive abilities, though limited, were functional.

In 1976 Fiori suffered a second injury, which left him in a persistent vegetative state. This condition has continued until the present. Although his heart still beats and some primitive reflexes still respond to applied stimuli, all cognitive brain functions and thought processes are inoperable.[1] He feels no pain or pleasure, and he is unable to interact in his environment or to communicate with others. He cannot think; he

---

1. A patient in a persistent vegetative state is not "brain dead." Although most brain functions are inoperable, vital functions such as heart beat and breathing persist. See: *Lovato v. District Court in and for the Tenth Judicial Dist.,* 198 Colo. 419, 426 n. 6, 601 P.2d 1072, 1076 n. 6 (1979). A patient who is brain dead, on the other hand, is non-responsive to all stimuli, unable to breathe independently, and displays absolutely no reflexive movements. *Id.* at 426, 601 P.2d at 1077. See also: *Matter of Guardianship of L.W.,* 167 Wis.2d 53, 62–64 n. 1, 482 N.W.2d 60, 63 n. 1 (1992), citing the Guidelines for State Court Decision Making in Authorizing or Withholding Life–Sustaining Medical Treatment, National Center for State Courts 1991, Appendix B.

cannot speak; he cannot move and he cannot eat. He receives all nutrition, hydration and medication through a gastrostomy tube inserted into his stomach. There is no hope that he will recover or that his condition will improve.

In 1992, Rosemarie Sherman, Fiori's mother, after consulting with Fiori's physicians and family, concluded that further treatment was not beneficial and that all artificial life sustaining measures should be terminated.[2] However, Mayo Nursing refused to carry out her wishes without a prior court order. Therefore, Sherman filed a petition requesting judicial authorization to discontinue life sustaining procedures. A hearing was held and, although no direct evidence of Fiori's own desires was presented, the trial court applied an objective standard and granted Sherman's petition. The Office of the Attorney General on behalf of the Commonwealth of Pennsylvania filed the instant appeal.

As the majority recognizes, there will be many occasions when a patient's close family members, along with the patient's physician, are most capable of deciding, without court intervention, whether life sustaining treatment should be discontinued for a patient in a persistent vegetative state. Although I would not require judicial involvement in such cases, I recognize that, as a practical matter, there will be frequent occasions when the courts will be called upon to decide such intimate family matters. Thus, in the instant action, Sherman initiated contact with the courts because the convalescent facility which cared for her son had refused to accept her requests for her son's treatment. Such a case, in my judgment, can properly be brought before a court. Other cases in which judicial intervention will be required or requested come readily to mind.

Debate over a patient's right to refuse life sustaining medical treatment has been fueled by advances in medical technology which have enabled medical practitioners to prolong life where, in the past, death would have been shortly forthcoming. A semblance of life may now be sustained long after

2. Sherman had been appointed legal guardian of her son in 1980 by order of the Bucks County Orphans' Court.

conscious existence has ceased. "Hopelessly or terminally ill patients who in the past would have met with a swift end, now find that medical science can sustain them, near the threshold of death, but not yet across it." *In re Estate of Longeway,* 133 Ill.2d 33, 39, 139 Ill.Dec. 780, 782, 549 N.E.2d 292, 294 (1989). As the Supreme Court of Arizona said in *Rasmussen by Mitchell v. Fleming,* 154 Ariz. 207, 741 P.2d 674 (1987):

> Not long ago the realms of life and death were delineated by a bright line. Now this line is blurred by wondrous advances in medical technology—advances that until recent years were only ideas conceivable by such science-fiction visionaries as Jules Verne and H.G. Wells. Medical technology has effectively created a twilight zone of suspended animation where death commences while life, in some form, continues. Some patients, however, want no part of a life sustained only by medical technology. Instead, they prefer a plan of medical treatment that allows nature to take its course and permits them to die with dignity.

> As more individuals assert their right to refuse medical treatment, more frequently do the disciplines of medicine, law, philosophy, technology, and religion collide. This interdisciplinary interplay raises many questions to which no single person or profession has all the answers.

*Rasmussen by Mitchell v. Fleming, supra* at 211, 741 P.2d at 678.

Numerous courts have acknowledged that individuals possess the right to refuse life sustaining medical treatment, including artificial nutrition and hydration, and have found as its basis the right to privacy in the United States Constitution, the rights contained in state constitutional provisions, the common law right to be free from unwanted bodily invasions, and various statutory enactments. See, e.g.: *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (federal constitution); *Rasmussen by Mitchell v. Fleming, supra* (federal and state constitutions and common law); *Foody v. Manchester Memorial Hosp.,* 40 Conn.Sup. 127, 482 A.2d 713 (1984) (same); *In re Severns,* 425 A.2d 156 (Del.Ch.1980) (federal constitution); *In re L.H.R.,*

253 Ga. 439, 321 S.E.2d 716 (1984) (same); *In re Estate of Longeway, supra* (common law and statutory provisions); *Matter of Lawrance,* 579 N.E.2d 32 (Ind.1991) (federal and state constitutions and statutory provisions); *DeGrella by Parrent v. Elston,* 858 S.W.2d 698 (Ky.1993) (common law); *In re P.V.W.,* 424 So.2d 1015 (La.1982) (state statute); *Brophy v. New England Sinai Hosp., Inc.,* 398 Mass. 417, 497 N.E.2d 626 (1986) (federal constitution and common law); *Mack v. Mack,* 329 Md. 188, 618 A.2d 744 (1993) (common law); *In re Guardianship of Crum,* 61 Ohio Misc.2d 596, 580 N.E.2d 876 (Ohio Prob.1991) (federal constitution); *Matter of Guardianship of L.W.,* 167 Wis.2d 53, 482 N.W.2d 60 (1992); (federal and state constitutions and common law). "No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference by others, unless by clear and unquestionable authority of law." *Matter of Guardianship of L.W., supra* at 68, 482 N.W.2d at 65, quoting *Union Pacific Railway Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891). Cf. *In re C.A.,* 236 Ill.App.3d 594, 603–04, 177 Ill.Dec. 797, 803, 603 N.E.2d 1171, 1177 (1992), *appeal denied,* 148 Ill.2d 642, 183 Ill.Dec. 20, 610 N.E.2d 1264 (1993).

A majority of courts also agree that the right to self determination is not lost merely because an individual has become incompetent. See, e.g.: *Rasmussen by Mitchell v. Fleming, supra,* 154 Ariz. at 219, 741 P.2d at 686; *Foody v. Manchester Memorial Hosp., supra,* 40 Conn.Sup. at 133, 482 A.2d at 718; *In re Severns, supra* at 159; *In re L.H.R., supra,* 253 Ga. at 439, 321 S.E.2d at 718; *In re P.V.W., supra* at 1017; *Mack v. Mack, supra,* 329 Md. at 211, 618 A.2d at 756; *In re Guardianship of Crum, supra,* 61 Ohio Misc.2d at 603, 580 N.E.2d at 881–882; *Matter of Guardianship of L.W., supra,* 167 Wis.2d at 72–74, 482 N.W.2d at 67. "The existence and viability of a long established personal right does not hinge upon its prescient exercise, nor is it extinguished when one is adjudged incompetent." *Matter of Guardianship of L.W., supra* at 74, 482 N.W.2d at 67.

Where a patient's wishes regarding the use of life sustaining treatment can be discerned, those wishes should be honored. Frequently, however, an individual will not have prepared explicit instructions regarding treatment in the event that he or she becomes incompetent. See: *Id.* Although it is more difficult to determine the circumstances under which life sustaining measures should cease where a patient has become incompetent without having expressed his or her desires, it should not be assumed that a failure to express an intent manifests a decision to accept any and all extraordinary life prolonging treatment. *Id.* at 74–76, 482 N.W.2d at 68.

Whether it would be appropriate to discontinue life sustaining treatment where the intent of an incompetent patient is not known should be judged by applying objective standards. See, e.g.: *Rasmussen by Mitchell v. Fleming, supra,* 154 Ariz. at 222, 741 P.2d at 689; *Foody v. Manchester Memorial Hosp., supra,* 40 Conn.Sup. at 139, 482 A.2d at 721; *In re Guardianship of Myers,* 62 Ohio Misc.2d 763, 773–774, 610 N.E.2d 663, 669–670 (Oh.Com.Pl.1993); *In re Guardianship of Crum, supra,* 61 Ohio Misc.2d at 605, 580 N.E.2d at 882; *Matter of Guardianship of L.W., supra,* 167 Wis.2d at 74–76, 482 N.W.2d at 68. "An incompetent is a ward of the state, and [the] state's parens patriae power requires [a] court to ensure that the ward's best interests are protected." *Matter of Guardianship of L.W., supra* at 76, 482 N.W.2d at 68.

If the exercise of the right [to self determination] is to be maintained where no expression has been made by an incompetent patient as to treatment, it must take place within the context of an analysis which seeks to implement what is in that person's best interests by reference to objective societally shared criteria. See Commission Report, pp. 134–35. "In assessing whether a procedure or course of treatment would be in a patient's best interest, the decision maker must take into account such factors as the relief of suffering, the preservation or restoration of functioning and the quality as well as the extent of life sustained." Commission Report, p. 135.

*Foody v. Manchester Memorial Hosp., supra,* 40 Conn.Sup. at 139, 482 A.2d at 721.

A court which is asked to decide whether medical treatment should be discontinued should consider whether the family's or guardian's recommendation would be in the "best interests" of the patient.

> Under the best interests standard, the surrogate decision-maker assesses what medical treatment would be in the patient's best interest as determined by such objective criteria as relief from suffering, preservation or restoration of functioning, and quality and extent of sustained life. Commission Report at 135. 'An accurate assessment will encompass consideration of the satisfaction of present desires, the opportunities for future satisfactions, and the possibility of developing or regaining the capacity for self determination.'

*Rasmussen by Mitchell v. Fleming, supra,* 154 Ariz. at 222, 741 P.2d at 689 (footnote omitted). When applying an objective standard it is appropriate for the court to consider any relevant expressions made by the patient while competent, the treatment options which are presently available, the benefits or non-benefits thereof, the likelihood of improvement, the amount of suffering or discomfort associated with either course, the degree of dependence upon the treatment, the intrusiveness of the procedure, the presence of progressive physical deterioration and the opinion, if any, of the hospital bio-ethics committee. See: *Foody v. Manchester Memorial Hosp., supra,* 40 Conn.Sup. at 134, 482 A.2d at 718–719; *Rasmussen by Mitchell v. Fleming, supra,* 154 Ariz. at 222, 741 P.2d at 689; *In re Myers, supra,* 62 Ohio Misc.2d at 774, 610 N.E.2d at 670; *Matter of Guardianship of L.W., supra,* 167 Wis.2d at 84–86, 482 N.W.2d at 72–73.

Life is generally worth preserving. Therefore, the burden of proof must necessarily rest upon a petitioner who asks the court to order discontinuation of extraordinary life sustaining measures. He or she will be required to show that the continuation of extraordinary life sustaining measures will not serve the best interests of the patient. In such cases, a court

should be able to find that "[a] dignified and natural death [will] outweigh the interest of maintaining a physiological life as long as medically possible." *Matter of Guardianship of L.W., supra* at 76, 482 N.W.2d at 68. "To require someone to remain in [a persistent vegetative state] for perhaps decades cannot be in the best interest of that individual. Indeed it can be argued that to keep an individual in that condition, with no hope for recovery, is not only against the best interest, but is inhumane." *In re Myers, supra,* 62 Ohio Misc.2d at 775, 610 N.E.2d at 670. Where the benefits of continued treatment are limited and outweighed by its burdens on the patient, therefore, it may be in the patient's best interest to discontinue treatment.

> The primary basis for medical treatment of patients is the prospect that each individual's interests (specifically, the interest in well-being) will be promoted. Thus, treatment ordinarily aims to benefit a patient through preserving life, relieving pain and suffering, protecting against disability, and returning maximally effective functioning. If a prognosis of permanent unconsciousness is correct, however, continued treatment cannot confer such benefits.

*Matter of Conservatorship of Torres,* 357 N.W.2d 332, 338 (Minn.1984). Although death may result from the termination of treatment, it will be certain and relatively quick; if the patient is allowed to languish for several years, death will still be imminent but will occur at an unknown time. Where it is certain that further extraordinary treatment will produce no beneficial result for a vegetative patient, treatment may be discontinued.

The decision in such cases will involve a choice between life and death. Therefore, a trial court must exercise caution and remain conscious of the profound responsibility which has been vested in it. An appellate court, it seems to me, must also be cognizant of the profound responsibility which has been vested in the trial court and should not substitute its judgment for that of a trial court. It follows that a decision of a trial court should not be disturbed absent an abuse of discretion or an error of law.

In granting Mrs. Sherman's petition, the trial court properly applied a "best interests" standard. Fiori is completely incapable of participating in or recognizing his environment. He has no cognitive abilities and only the most primitive ability to respond to stimuli. He has persisted in his present condition without improvement for seventeen years. The medical evidence is uncontroverted that his condition will never improve. Although medical technology may be employed to perpetuate his existence for several more years, he will continue to deteriorate. As Fiori's family and physicians have already realized, the continued use of life sustaining treatment will not be beneficial to him. The time has come to suspend attempts to prolong his life unnaturally and to allow his life to follow its natural course. The time has come to allow Fiori to rest.

Because I would hold that the trial court considered appropriate criteria in determining whether Mrs. Sherman's petition should be granted, I would affirm the court's order which permitted the withdrawal of life sustaining nutrition and hydration. Because the patient is already represented by a guardian and because a guardian ad litem could have added nothing to the trial court's careful and sensitive consideration of the petition, I would reject the Attorney General's contention that we should reverse for the appointment of a guardian ad litem.

ROWLEY, President Judge, joins.

McEWEN, Judge, concurring.

"Your money or your life!", demanded the highwayman of the horseman. "I can protect your money, but not your life.", decreed the chancellor. How anomalous that both the lawless and the lawful share a particular focus—property.

The compelling presentation of divergent views expressed by my esteemed colleagues fulfills so admirably our intermediate appellate role and so precisely defines the issues as to readily enable review by our Supreme Court. Thus, while, under the facts of this case, I concur in the decision to permit the termination of life-sustaining treatment of Daniel Joseph

Fiori, I refrain from joinder in any expression since I am beset by a nagging uncertainty: what values does a society reflect when it permits its legal system to require careful judicial scrutiny of decisions affecting the property of an incompetent, but precludes similar judicial scrutiny of a decision to terminate the life of the incompetent?

OLSZEWSKI, Judge, concurring.

I agree with the majority's thoughtful opinion in all respects. I feel that one aspect of the concurring and dissenting opinion merits a brief response.

The majority uses the individual's right to privacy and self-determination as the starting point in its analysis, and concludes that in the narrow fact situation before us, the legal system will not aid in the difficult decision of when to terminate life support. The dissent arrives at a different conclusion by beginning its analysis with the Commonwealth's duty as *parens patriae* of its citizens. This obligation to protect the welfare of disabled citizens leads the dissent to conclude that the courts must be involved in every decision to terminate life support.

I would observe that the Commonwealth's *parens patriae* power can be exercised through bodies other than the courts and legal system. In the present case, the Commonwealth's interests in protecting its disabled citizens and preserving life are amply discharged by the majority's requirement that two doctors participate in every termination decision. To be licensed to practice medicine in this Commonwealth, doctors must undergo extensive training in medical ethics. This training is far more specialized than anything we members of the bench and bar receive in our formal education. When the only parties to a termination decision are the surrogate decision maker and the Commonwealth as *parens patriae* of the disabled subject, two duly licensed doctors are perfectly capable of representing the Commonwealth's interests. The majority rightly observes that in this narrow situation, the court system is likely to contribute nothing except delay, expense and intrusion.

Judge Popovich begins his dissent by noting that courts are a reservoir of wisdom on life and death decisions. The same is true of the medical profession, which specializes in the instant subject matter. We members of the bench and bar ought to keep in mind that we are not the only licensed professionals in this Commonwealth trained in and capable of making difficult ethical decisions.

POPOVICH, Judge, concurring and dissenting.

I agree with the result ultimately reached by the Majority, but I disagree with the course pursued to achieve that end. Specifically, the Majority offers that the courts should refrain from being a forum for the resolution of "life and death" decisions, it believing that a "close family member and two qualified physicians" are in the best position to make such an assessment in the case of a comatose patient who never articulated his wishes should he find himself in an irreversible vegetative condition.

The state, as the parens patriae of its citizenry, is not to be dismissed as an intrusive, uninvited participant when the life of one of its own is at risk. In just such instances, the courts (as an extension of state government) have been a reservoir of wisdom and counseled reflection when a life in being hangs in the balance, e.g., "death row" inmates, tubal ligation of mentally retarded and blood transfusion for a child of parents who oppose such a procedure for religious reasons. No less should such sagacity be dismissed as an unwarranted invasion into a "life and death" situation such as the one facing the Fiori family.

The amount of time and effort it would take to insure that a comatose patient on life-support, who never espoused his or her position in advance of such a condition, should have such extraordinary medical services terminated by securing the imprimatur of a court is no more burdensome than obtaining consensus among the family and two physicians regarding the irreversible vegetative state of the comatose patient. Expedited hearings are available for such court-supervised decision-making concerning the sanctity of human life and would

not be an invasive act into one's privacy. Rather, such a process would assure that all parties are truly acting with the best interests of the patient in mind and not motivated by any ulterior motive hidden from the light of scrutiny by veiled concerns for the patient's well-being.

As a result, unlike the Majority, I am in favor of involving the courts in those cases where a patient, who has never expressed his or her concerns on life-sustaining medical treatment, is in a persistent vegetative state and no reasonable likelihood of awakening from the coma is foreseen by medical personnel. In support of such a position, I offer the following observations, preceded by an account of the facts precipitating this case.

In June of 1971, while enlisted in the Navy, Daniel Joseph Fiori sustained head injuries when he was thrown from a motorcycle operated on a military base. He was comatose until 1972 after which he regained consciousness. But he was partially paralyzed, confined to a wheelchair and had severely limited cognitive abilities: he was only able to articulate the words "itch" and "eye" in all responses.

In 1976, Daniel fractured his leg and was admitted to a veterans administration hospital. During his stay, he suffered a second head injury which left him totally comatose so that all medications, fluids and nutrition were (and still are) administered through a gastrostomy tube surgically inserted into his stomach.

In 1980, Daniel's mother (Rosemarie Sherman) was appointed guardian of his person "to make for him those decisions including the prosecution of a contemplated lawsuit." Thereafter, a settlement was reached wherein the federal government established a trust fund which provided, *inter alia,* "full-time nursing ... care." The trust was set up whereby the longer Daniel lived, the more would be available to his mother as the recipient of an annuity of up to $400,000.00 upon his demise.[1]

---

1. The trust document provided for increments in benefits tied to the longevity of Daniel's life; to-wit:

Presently, Daniel lives at Mayo Nursing and Convalescent Center in Philadelphia, which, all parties agree, has provided "excellent" care. Likewise, Ms. Sherman has been extraordinarily attentive to Daniel's needs throughout this period—1971 to the present.

After Daniel's second head injury left him totally incapacitated and oblivious to the world, Ms. Sherman reached a decision to cease artificial life-support after consultation with her family members and priest, all of whom concurred in the decision to remove life-support. However, the Mayo nursing and Convalescent Center refused to accede to Ms. Sherman's wishes absent a court order sanctioning the removal of the gastrostomy tube. Accordingly, Ms. Sherman filed a "Petition For Authorization To Discontinue Life–Sustaining Procedures," which included cessation of the abdominal feeding tube and discontinuance of all medications and life-sustaining procedures for Daniel.

Prior to scheduling a hearing for review of Ms. Sherman's petition, the Attorney General of the Commonwealth of Pennsylvania, after being served with the petition, secured an order of court appointing an independent medical expert (Dr. David G. Cook, clinical professor of neurology, University of Pennsylvania School of Medicine) to evaluate Daniel and submit a report to the court. This assessment was made and supplemented by a neurological examine performed by Dr. William Stover Wiggins in April of 1992.

$25,000.00 on the second anniversary of the annuity
$50,000.00 on the fifth anniversary of the annuity
$100,000.00 on the tenth anniversary of the annuity
$150,000.00 on the fifteenth anniversary of the annuity
$200,000.00 on the twentieth anniversary of the annuity
$250,000.00 on the twenty-fifth anniversary of the annuity
$300,000.00 on the thirtieth anniversary of the annuity
$350,000.00 on the thirty-fifth anniversary of the annuity
$400,000.00 on the fortieth anniversary of the annuity

The incremental nature of the annuity to Ms. Sherman being linked to the longevity of Daniel's existence would appear to render specious the Attorney General's argument that a conflict of interest arises barring Ms. Sherman from being guardian. See Appellant's Brief at 11. Her interest would be geared toward prolonging his life and not curtailing it.

On September 1, 1992, a hearing was conducted before the Honorable Leonard Sokolove. The only two witnesses to testify were Dr. Wiggins and Ms. Sherman.

Dr. Wiggins, a board certified neurologist, examined the then 42–year–old Daniel on April 3, 1992, and found him to be nonresponsive to stimuli, save for withdrawal movements when pinched. This was described by the witness as a "primitive" reflex which did not require any brain function. Daniel's breathing was being aided by a tracheostomy and a feeding tube (gastrostomy) that had been surgically inserted into his stomach to permit the receipt of medication and nutrition.

Further, Dr. Wiggins conducted EEG and MRI tests, both of which showed that "[t]here were no areas of normal brain activity" and there were "profound abnormalities of both cerebral hemispheres." [2] Someone with those abnormalities, noted the witness, would not be able to eat, speak or interact in an appropriate way in our environment. Also, observed the witness, such a condition deprives a person of the ability to think, experience pain or pleasure.

After examining the patient, the medical records and his caretakers, Dr. Wiggins was of the opinion that Daniel was in a "persistent vegetative state",[3] and the only thing he could do

2. As observed by Dr. Wiggins, the "periphery" of the brain enables one to talk and think, while one's breathing and heartbeat are controlled by activity "deep in the ... brain stem."

3. Dr. Wiggins defined persistent vegetative state as follows:
"... it's one who breathes but wouldn't interact with you in any way. The capacity to chew and swallow in a normal manner is lost because those functions are voluntary, as with looking or hearing effectively. The only thing [one in a persistent vegetative state] can do effectively is breathe, and their heart beat." N.T. 17
As noted by the United States Supreme Court in *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 267 n. 1, 110 S.Ct. 2841, 2846 n. 1, 111 L.Ed.2d 224 (1990):
Dr. Fred Plum, the creator of the term "persistent vegetative state" and a renowned expert on the subject, has described the "vegetative state" in the following terms:
" 'Vegetative state describes a body which is functioning entirely in terms of its internal controls. It maintains temperature. It maintains heart beat and pulmonary ventilation. It maintains digestive

effectively was breathe and his heart would continue to beat. Dr. Wiggins believed that Daniel would not improve. This opinion was expressed by the second neurologist (Dr. Cook) who examined Daniel and prepared a report for the court which found him to be in the same condition.

Both experts believed, within a reasonable degree of medical certainty, that Daniel's condition would not improve as evidenced by his status quo for the last seventeen years. Notwithstanding such a fact, in light of the "superb" nursing care Daniel had received (and was continuing to receive) over the years, his life-span could extend for another ten to twenty years.

However, in response to a query by the court in regard to the quality-of-life aspect, Dr. Wiggins opined that Daniel does not have sufficient cognitive power to know of his own existence, nor does he experience pleasure or pain.

When Ms. Sherman took the stand, she gave an account of a son who, after his 1971 motorcycle accident, could communicate "facially" with her and by the use of the words "itch" and "eye" to express his wants and needs.[4] After his second injury in 1976, whereby he became comatose, he was not able to exhibit any awareness of his situation. His condition has not changed. Although he can "express" pain, he makes no sound, and he cannot hear or see.

Ms. Sherman admitted that she never spoke to her son about his wishes should the situation in which he now finds himself occur. Nevertheless, in the absence of any quality to his life, Ms. Sherman believed her son should be afforded the opportunity, after seeing his limp and lifeless body over the years, to "rest in peace and be with God."

activity. It maintains reflex activity of muscles and nerves for low level conditioned responses. But there is no behavioral evidence of either self-awareness or awareness of the surroundings in a learned manner.'" *In re Jobes*, 108 N.J. 394, 403, 529 A.2d 434, 438 (1987).

4. Despite speech classes in 1973, Daniel did not learn to speak. He did learn "behavior" and was described by his mother as "more sad" as time went on and prone to exhibit agitation and tears over his frustration.

Because her son "loved life", e.g., he was a football player, a surfer and a drummer in the high school band, to see him "suffering" was not in accordance with his wishes: "He would not want to live this way." She based this conclusion upon the fact, as she phrased it, "Because I knew my son better than anyone knew him" and "he liked living." N.T. 48.

After the close of testimony, the court issued an opinion and order granting the petitioner/Ms. Sherman her request to withdraw all life-support from her son. The Commonwealth of Pennsylvania's Attorney General filed exceptions which were denied and followed by the perfection of the instant appeal challenging the issuance of the order on grounds that:

1. The Orphans' Court erred by failing to appoint a guardian *ad litem* to represent the patient's interest in a life-and-death proceeding.

2. The Orphans' Court erred by authorizing the patient's death without requiring clear and convincing evidence of his intent about life-sustaining medical treatment.

Before addressing the merits of the first issue posed, I will respond to the argument of the petitioner/Ms. Sherman that the Attorney General's failure to raise the guardian *ad litem* issue at trial results in its waiver.

In this jurisdiction, it is beyond cavil that the failure to raise issues in a timely fashion renders them waived for appellate purposes. See *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974); Pa.R.App.P. 302(a). At bar, the Attorney General states that a pre-trial hearing was conducted in June of 1992. At that time, it is alleged, he "requested the court to appoint ... an independent medical expert and a guardian *ad litem*." Appellant's Brief at 4.

However, the record discloses that the Attorney General reduced to writing *only* his "recommendations" for the appointment of a neurologist to examine Daniel and a continuance of the pre-trial hearing pending completion of the testing. See Record No. 9. Both requests were granted by the court. No mention appears of the guardian and notice issues until the

filing of exceptions to the court's order granting the petitioner/Ms. Sherman her request for relief. *Id.*

Thus, but for the Attorney General's exceptions and reference in his appellate brief to the proffering of the issues sought to be reviewed, I have no record evidence to refute the court's finding that the issues were waived for failure to raise either one at the pre-trial hearing. Contrast *Thatcher's Drugs v. Consolidated Supermarkets, Inc.*, 391 Pa.Super. 524, 571 A.2d 490 (1990), rev'd on other grounds, 535 Pa. 469, 636 A.2d 156 (1994). In fact, the court denied specifically the Attorney General's exception to the guardian claim. See Lower Court Opinion at 2 (Emphasis added).

Because the record is not supportive of the Attorney General's position (and reference to an admission by a party-opponent in their brief to the same subject matter is not a substitute for record evidence[5]), a court may not ignore noncompliance with established case law as to preservation of an issue for review.[6] See *Dilliplaine*, supra; *Thatcher's Drugs*, supra; *Commonwealth v. Rini*, 285 Pa.Super. 475, 427 A.2d 1385 (1981).

**5.** Arguments made in the briefs of litigants are not sufficient to fill the void created by a deficient record on a preservation question. *McCormick v. Allegheny General Hosp.*, 364 Pa.Super. 210, 527 A.2d 1028 (1987).

**6.** Just as the Attorney General formalized his "recommendations" to have an expert appointed and a continuance of the hearing, the same procedure could have followed to document his request for the appointment of a guardian ad litem. The court's refutation of the Attorney General's allegations of preservation (appearing as they do in his appellate brief) not being substantiated in the record renders them waived for review purposes. See *Commonwealth v. Rini*, 285 Pa.Super. 475, 427 A.2d 1385 (1981).

I would observe that at the pre-trial hearing, the Attorney General could have had the proceedings stenographically preserved if they were not already being recorded. His failure to act to either have the hearing transcribed or if being already recorded have the transcription made part of the record, see Pa.R.App.P. 1911 and 1912, exposes him to the rigors of the waiver doctrine. It is not the function of this court to scour the record to make sure that all relevant documents are included within the official record forwarded for appellate review. The responsibility to so act is upon the appellant. See Rule 1911.

For the Attorney General's failure to preserve the first issue for review, I, as did the court below, find it to be waived.[7]

The remaining issue asks this Court to adopt a "clear and convincing" standard of proof in cases known in the vernacular as "right to die" cases, the absence of which is assigned presently as error necessitating a remand as a remedial measure to judge anew Ms. Sherman's petition seeking withdrawal of life-support treatment for Daniel.

Before embarking upon an analysis of what standard of proof is to be applied to a guardian's efforts to withhold life-sustaining treatment to an incompetent ward in a persistent vegetative state,[8] I wish to point out that this is *not* a case in which the Court is asked to let someone perish.

Daniel is neither "medically" dead, nor is he terminally ill. Rather, *this Court is asked to permit a guardian to put in motion a series of events allowing Daniel to die by starvation and dehydration.* This type of benevolent deprivation of

---

7. Even if, *arguendo*, I were to hold otherwise, my review of the entire record and law applicable to the subject at hand would lead me to find no abuse of discretion on the part of the court below in failing to appoint a guardian ad litem.

I believe that Daniel's interests were represented adequately by the guardian of his person, i.e., Ms. Sherman. See *LaRocca Estate*, 431 Pa. 542, 549–550, 246 A.2d 337, 340 (1968); *Curry Appeal*, 390 Pa. 105, 109, 134 A.2d 497, 499 (1957); 20 Pa.C.S.A. § 3504 (Purdon's Pa.Leg. Ser., No. 2, 1992). Thus I see no need to remove Ms. Sherman for another or appoint a guardian ad litem.

Further, because no physician or health care provider can be subject to criminal or civil liability for participating in any conduct related to life-sustaining treatment for a patient, see Chapter 54, Section 5407(a) of the Advance Directive for Health Care Act (Purdon's Pa.Leg.Ser., No. 2, 1992) ("the Act"), nor could one argue convincingly that a guardian acting pursuant to a court order would be exposed to criminal or civil liability for similar conduct insulated under the Act from prosecution or liability, I see no purpose to be served by the participation of a district attorney in cases like the one at bar.

8. I would remark that I am limiting my analysis to a situation in which a competent person has become incompetent without having expressed his/her view on continuing life-sustaining treatment when he/she is in a persistent vegetative state.

I am in no way formulating a standard of review for any scenario other than the one presently before this Court.

648

nutrition and hydration puts in perspective a debate (as evidenced by the multiple briefs espousing opposite results) not between life and death, but a discussion focusing upon the quality of life (or the absence thereof) and death.

To be sure, all litigants and *amici curiae* have coalesced to achieve a common objective of doing what is best for Daniel, and all others similarly situated.[9] Thus, this Court's role is a limited one in that our decision must be predicated upon legal principles and reasoned analysis to remain true to our goal of ameliorating disputes limited to the facts with which we are presented. See note 8, supra.

This case is one of first impression in Pennsylvania in that no appellate court has ruled on the question posed. Nonetheless, the courts of some of our sister states and our own Courts of Common Pleas have been confronted with similar issues.[10] Near unanimity has been attained to permit individ-

9. In resolving the issue under scrutiny, I wish to acknowledge the benefit of the briefs of *amici curiae:* The Pennsylvania Medical Society urging affirmance and the Pennsylvania Catholic Conference seeking reversal of the court's order.

10. My examination of the cases has uncovered the following decisions dealing with an issue similar to the one confronting us here; to-wit: *Rasmussen v. Fleming,* 154 Ariz. 207, 741 P.2d 674 (1987); *Barber v. Super.Ct. of State of Calif.,* 147 Cal.App.3d 1006, 195 Cal.Rptr. 484 (1983); *Dority v. Super.Ct. of San Bernadino County* 145 Cal.App.3d 273, 193 Cal.Rptr. 288 (1983); *Bartling v. Glendale Adventist Medical Center,* 184 Cal.App.3d 961, 229 Cal.Rptr. 360 (1986); *Bouvia v. Super.Ct. of Los Angeles,* 179 Cal.App.3d 1127, 225 Cal.Rptr. 297 (1986); *In re Drabick III,* 200 Cal.App.3d 185, 245 Cal.Rptr. 840 (1988); *Trujillo v. Dist.Ct. in & for Tenth Judicial Dist.,* 198 Colo. 419, 601 P.2d 1072 (1979); *Foody v. Manchester Memorial Hosp.,* 40 Conn.Sup. 127, 482 A.2d 713 (1984); *Severns v. Wilmington Medical Center,* 425 A.2d 156 (Del.Ch.1980); *Satz v. Perlmutter,* 362 So.2d 160 (Fla.Dist.Ct.App. 1978); *In re Guardianship of Barry,* 445 So.2d 365 (Fla.Dist.Ct.App. 1984); *John F. Kennedy Memorial Hosp. v. Bludworth,* 452 So.2d 921 (Fla.1984); *Corbett v. D'Allessandro,* 487 So.2d 368 (Fla.Dist.Ct.App. 1986); *Wons v. Public Health Trust of Dade County,* 500 So.2d 679 (Fla.Dist.Ct.App.1987); *In re L.H.R.,* 253 Ga. 439, 321 S.E.2d 716 (1984); *Morgan v. Olds,* 417 N.W.2d 232 (Iowa App.1987); *In re PVW,* 424 So.2d 1015 (La.1982); *Mack v. Mack,* 329 Md. 188, 618 A.2d 744 (1993); *In re Joseph Gardner,* 534 A.2d 947 (Me.1987); *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977); *In re Dinnerstein,* 6 Mass.App.Ct. 466, 380 N.E.2d 134 (1978); *In re Spring,* 380 Mass. 629, 405 N.E.2d 115 (1980); *Custody of a Minor,* 385 Mass. 697, 434 N.E.2d 601 (1982); *In the Matter of Hier,*

uals seeking death for themselves or their wards to accomplish that end. See *Cruzan by Cruzan v. Harmon*, 760 S.W.2d 408,

18 Mass.App.Ct. 200, 464 N.E.2d 959 (1984); *Brophy v. New England Sinai Hosp.*, 398 Mass. 417, 497 N.E.2d 626 (1986); *In the Matter of Torres*, 357 N.W.2d 332 (Minn.1986); *In re Quinlan*, 70 N.J. 10, 355 A.2d 647 (1976); *In the Matter of Conroy*, 98 N.J. 321, 486 A.2d 1209 (1985); *Iafelice v. Luchs*, 206 N.J.Super. 103, 501 A.2d 1040 (1985); *In the Matter of Clark*, 210 N.J.Super. 548, 510 A.2d 136 (Ch.Div.1986); *In the Matter of Requena*, 213 N.J.Super. 475, 517 A.2d 886 (Ch.Div.1986); *In the Matter of Farrell*, 108 N.J. 335, 529 A.2d 404 (1987); *In the Matter of Jobes*, 108 N.J. 394, 529 A.2d 434 (1987); *In the Matter of Peter*, 108 N.J. 365, 529 A.2d 419 (1987); *In the Matter of Eichner*, 102 Misc.2d 184, 423 N.Y.S.2d 580 (N.Y.Sup.Ct.1979); *In the Matter of Lydia E. Hall Hospital v. Cinque*, 116 Misc.2d 477, 455 N.Y.S.2d 706 (N.Y.Sup.Ct.1982); *A.B. v. C.*, 124 Misc.2d 672, 477 N.Y.S.2d 281 (N.Y.Sup.Ct.1984); *Crouse Irving Memorial Hosp. v. Paddock*, 127 Misc.2d 101, 485 N.Y.S.2d 443 (N.Y.Sup.Ct.1985); *In the Matter of Saunders*, 129 Misc.2d 45, 492 N.Y.S.2d 510 (N.Y.Sup.Ct.1985); *In the Matter of Delio*, 134 Misc.2d 206, 510 N.Y.S.2d 415 (N.Y.Sup.Ct.1986); *In re Harvey "U"*, 116 A.D.2d 351, 501 N.Y.S.2d 920 (N.Y.App.Div. 1986); *In the Matter of O'Brien*, 135 Misc.2d 1076, 517 N.Y.S.2d 346 (N.Y.Sup.Ct.1986); *Vogel v. Forman*, 134 Misc.2d 395, 512 N.Y.S.2d 622 (N.Y.Sup.Ct.1986); *In the Matter of Workman's Circle Home v. Fink*, 135 Misc.2d 270, 514 N.Y.S.2d 893 (N.Y.Sup.Ct.1987); *In the Matter of Weinstein*, 136 Misc.2d 931, 519 N.Y.S.2d 511 (N.Y.Sup.Ct.1987); *Leach v. Akron General Medical Center*, 68 Ohio Misc. 1, 426 N.E.2d 809 (1980); *In re Milton*, 29 Ohio St.3d 20, 505 N.E.2d 255 (1987); *In re Estate of Dorone*, 349 Pa.Super. 59, 502 A.2d 1271 (1985); *Ragona v. Preate*, 6 D. & C. 4th 202 (Lackawanna Cty.1990); *In the Matter of Colyer*, 99 Wash.2d 114, 660 P.2d 738 (1983); *Dinino v. State of Washington*, 102 Wash.2d 327, 684 P.2d 1297 (1984); *In the Matter of Hamlin*, 102 Wash.2d 810, 689 P.2d 1372 (1984); *In the Matter of Ingram*, 102 Wash.2d 827, 689 P.2d 1363 (1984); *In re Guardianship of Grant*, 109 Wash.2d 545, 747 P.2d 445 (1987).

For a survey of states having addressed the issue confronting us, the same is compiled at Beebe, Kristen L., *The Right to Die: Who Really Makes the Decision*, 96 Dick.L.Rev. 649 (1992).

Most recently, the Supreme Court of Kentucky had occasion to address the "right to die" issue in *DeGrella v. Elston*, 858 S.W.2d 698 (Ky.1993) a case which I find to be distinguishable from the one *sub judice* in that the incompetent in *DeGrella* "had expressed" her wishes not to be sustained if in a persistent vegetative state. Also, the case was premised upon the common law right of self-determination. Lastly, the Kentucky court adopted the position that a court need not be consulted in advance of withdrawing life-sustaining treatment where facts necessary to do so were carefully documented. The court held the matter was a *factual* not a *legal* question as to whether termination of life-support was warranted.

Consequently, I do not find that *DeGrella* dictates the course this Court should pursue, nor do I find it persuasive to cause me to discount totally the Advance Directive For Health Care Act (Purdon's Pa.Leg. Serv., No. 2, 1992) in assisting me in deciding what direction to take. See Majority's Opinion at 20–21 to the contrary.

413 (Mo.1988), aff'd sub nom. *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990).

Absent the existence of a statute on the subject, the various legal precepts relied upon to authorize the withdrawal of sustenance from a person in a persistent vegetative state have been reduced to a "best interest" analysis, "substituted judgment" criterion or a "clear and convincing" evidence standard of proof which draw their strengths from the federal or state constitutional rights of privacy. See, e.g., *Rasmussen v. Fleming,* 154 Ariz. 207, 741 P.2d 674, 682 (1987); *Bouvia v. Superior Ct.,* 179 Cal.App.3d 1127, 225 Cal.Rptr. 297, 301 (1986); *In re Severns,* 425 A.2d 156, 158 (Del.Ch.1980); *In re A.C.,* 573 A.2d 1235, 1244–47 (D.C.1990); *In re Guardianship of Browning,* 543 So.2d 258, 267 (Fla.Dist.Ct.App.1989), aff'd 568 So.2d 4 (Fla.1990); *Brophy v. New England Sinai Hosp.,* 398 Mass. 417, 497 N.E.2d 626, 633 (1986); *Mack v. Mack,* 329 Md. 188, 618 A.2d 744, 755 (1993); *In re Quinlan,* 70 N.J. 10, 355 A.2d 647, 663 (1976), cert. denied sub nom. *Garger v. New Jersey,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976); *Leach v. Akron Gen. Medical Center,* 68 Ohio Misc. 1, 22 O.O.3d 49, 426 N.E.2d 809, 814 (Com.Pl.1980); *In re Coyler,* 99 Wash.2d 114, 660 P.2d 738, 742 (1982).

Equally applicable to the right of an individual to forego life-sustaining medical treatment is the common law right to freedom from unwanted interference with bodily integrity ("self-determination"). *In re Rosebush,* 195 Mich.App. 675, 491 N.W.2d 633, 635 (1992); Meisel, *The Right to Die* 49 (1989 and 1993 Supp.); Sloan, Irving J., *THE RIGHT TO DIE: Legal and Ethical Problems* 5 (1988); Note, *In re Quinlan Revisited: The Judicial Role in Protecting the Privacy Right of Dying Incompetents,* 15 Hast.Const.L.Q. 479, 484 (1988). In *In re Conroy,* 98 N.J. 321, 346, 486 A.2d 1209, 1221–22 (1985), the court observed:

"No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all

restraint or interference of others, unless by clear and unquestionable authority of law ..., 'The right to one's person may be said to be a right of complete immunity: to be let alone.' "

In this jurisdiction, because a physician/patient relation is a consensual one, where a physician renders services in the absence of informed consent, there is an actionable tort under the theory of battery.[11] *Gray v. Grunnagle*, 423 Pa. 144, 223 A.2d 663 (1966); *In re Jane Doe*, 45 D. & C.3d 371, 382, 1987 WL 226878 (Phila.Cty.1987).

As noted by one commentator with regard to the "right of self-determination":

Since the right of self determination can only be exercised by a person competent to evaluate her condition, a patient lacking this capacity forfeits her right of self determination unless the surrogate decision maker, standing in the place of the incompetent, asserts the patient's preference. This surrogate decision-making is embodied in this doctrine of substitute judgment. Courts will rely on the substitute judgment doctrine only when the surrogate decision-maker demonstrates the incompetent person's preferences with reasonable certainty. When the patient expresses a treatment preference prior to her loss of competence, the court views the surrogate as merely supplying the capacity to enforce the incompetent's choice. Thus, a dying patient's right of self determination outweighs the rights of the patient's family, physician, or other care provider to base a treatment determination on their individual interests or ethical imperatives. The irreversible incompetent's right of self determination also outweighs the state's interest in

11. This precept, when read in conjunction with one's common law right of self-determination and the statutory signals one receives with the passage of the Act (see infra) during the 1992 session of the Pennsylvania General Assembly, constitutes the ingredients out of which I conclude that the right to choose to discontinue life-sustaining treatment may be exercised by an incapacitated person through his/her guardian. All is to be accomplished under the auspices of the court under a case-by-case basis. See, *e.g., Matter of Guardianship of Hamlin*, 102 Wash.2d 810, 689 P.2d 1372, 1375 (1984). See discussion infra.

preserving life, preventing suicide, protecting third party dependents of the dying patient, and preserving the ethical integrity of the medical profession.

The crucial trigger of the exercise of substitute judgment is a determination of what the incompetent's choice would be if she[/he] were competent. In the relatively few cases where the patient's preference is clear, substitute judgment is the proper surrogation method. *When a court cannot determine a patient's preference, strict application of the substitute judgment doctrine becomes impossible.* In such a case, allowing a surrogate to substitute her[/his] judgment for that of the patient would result in the surrogate's supplying the content of the incompetent's choice rather than merely implementing that choice. This clearly violates the principles underlying the use of substitute judgment to effectuate a patient's right of self determination. *Thus, courts do not normally rely on a surrogate to supply a treatment decision for a patient who has not previously expressed a clear preference on the issue.*[12]

Note, *In re Quinlan Revisited: The Judicial Role in Protecting the Privacy Right of Dying Incompetents,* 15 Hast. Const. L.Q. 479, 484–486 (1988) (Footnotes omitted; emphasis added).

In this Commonwealth, in a case which touches upon the issue presented for our consideration, the court applied a "clear and convincing evidence" standard to grant a guardian/spouse of a 64–year–old incompetent, who was in a persistent vegetative state with no hope of recovery, a declaratory judgment seeking authorization for the removal of a nasogas-

12. Interestingly, the Majority relies upon a "substituted judgment" approach, which, in its purest sense, rests upon the patient's expression of a view concerning medical issues in deciding whether to cease providing medical care. However, at bar this is undermined by the fact that nowhere in the record is there evidence that Fiori vocalized his position on the use of life-sustaining treatment should he or anyone else be in a persistent vegetative state. Thus, it would appear that the Majority is advocating the use of a "hybrid" substituted judgment approach.

tric feeding tube. See *Ragona v. Preate,* 6 Pa.D. & C.4th 202 (Lackawanna Cty., 1990).

Noting the absence of legislation governing the matter, the court embarked on an analysis of the case law on the subject; to-wit:

There is a plethora of precedent from other jurisdictions concerning the specific issue in the case and these courts have varied in the degree of specificity required before being guided by the prior expressed wishes of the patient. New York's highest court, in *In re O'Connor,* 72 N.Y.2d 517, 531 N.E.2d 607, 534 N.Y.S.2d 886 (Ct.App.1988, amended 1989), required a relatively high degree of specificity (e.g., "expressions were more than immediate reactions to the unsettling experience of seeing or hearing of another's unnecessarily prolonged death." 72 N.Y.2d at 532 [534 N.Y.S.2d at 893], 531 N.E.2d at 614). "Clear and convincing evidence" of a firm, settled decision was needed, and casual remarks, even if made repeatedly, were not sufficient. Furthermore, the statements had to be directly relevant to the patient's current condition and the proposed treatment. In contrast, New Jersey's highest court, in *In re Conroy,* 98 N.J. 321, 486 A.2d 1209 (1985), required less specificity regarding the patient's wishes (e.g., "It might take the form of reactions that the patient voiced regarding medical treatment administered to others." 486 A.2d at 1230). Indeed, where the wishes of the patient could not be directly established, the court required only that there be "some trustworthy evidence" of the patient's wishes, including "[e]vidence that, taken as a whole, would be too vague, casual, or remote" to provide direct evidence of the patient's wishes.

Of course the recent holding of the U.S. Supreme Court in *Cruzan [v. Director, Missouri Department of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) ] upheld Missouri's use of the clear and convincing evidence standard to establish a patient's previously expressed wishes. In that case, Nancy Cruzan's parents sought a court order directing the withdrawal of their daughter's artificial feeding and

hydration equipment after she had digressed into a persistent vegetative state. Missouri law provided that such life-sustaining measures could be discontinued only if the petitioner demonstrated the incompetent's express wishes as to the withdrawal of such treatment by "clear and convincing evidence." After analyzing the state interests at stake, the "Supreme Court of Missouri held that because there was no clear and convincing evidence of Nancy's desire to have life-sustaining treatment withdrawn under such circumstances, her parents lacked authority to effectuate such a request." *Cruzan, supra,* 497 U.S. at 265, 110 S.Ct. at 2845.

In *Cruzan,* the only testimony produced by the petitioner consisted of the incompetent's general statements made to a housemate that she would not want to live should she face life as a "vegetable." *Id.,* at 285, 110 S.Ct. at 2855. In critiquing the paucity of relevant testimony furnished by the *Cruzan* petitioner, the U.S. Supreme Court distinctly stated that "[t]he observations did not deal in terms with withdrawal of medical treatment or of hydration and nutrition." *Id.*

In short, the *Cruzan* court concluded that *a state is free to adopt a standard of proof in these proceedings which requires clear and convincing evidence of the incompetent's express wishes, although a state is equally at liberty to formulate less stringent standards.*

6 Pa.D. & C.4th at 206–208 (Emphasis added). Poised for consideration and found by the court was that Ruth Ragona was in an irreversible, persistent vegetative state, and that she had expressed her disdain for medical intervention by means of artificial feeding tubes.

In doing so, the court recounted, in detail, the medical history of the patient and her examination by four neurologists, all of whom agreed that she was in a persistent vegetative state, her condition was irreversible and there was no possibility of improvement.

Next, the court heard evidence of the patient's statements and conduct over a six-year span which it found was "clear and

convincing" evidence of an expressed intent to refuse life-sustaining treatment and, absent directly applicable legislation to the contrary, there was no transgression of any public policy of the Commonwealth.

It may be advantageous for the Court to proceed slowly, on a case by case basis, while awaiting action by the state legislature. See Moore, *"Two Steps Forward, One Step Back": An Analysis of New Jersey's Latest "Right-to-Die" Decisions,* 19 Rutgers L.J. 955, 957, 993–997 (1988). Since the *Ragona* decision, however, our General Assembly has seen fit to promulgate legislation which I find instructive in establishing standards for resolving the issue at hand.[13] Other states have found state statutory law relevant to the resolution of these issues. In *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 275–277, 110 S.Ct. 2841, 2849–51, 111 L.Ed.2d 224 (1990), it was reported that:

In *Conservatorship of Drabick,* 200 Cal.App.3d 185, 245 Cal.Rptr. 840, cert. denied, 488 U.S. 958 [109 S.Ct. 399, 102 L.Ed.2d 387] (1988), the California Court of Appeals authorized the removal of a nasogastric feeding tube from a 44–year-old man who was in a persistent vegetative state as a result of an auto accident. Noting that the right to refuse treatment was grounded in both the common law and a constitutional right of privacy, the court held that a state probate statute authorized the patient's conservator to order the withdrawal of life-sustaining treatment when such a decision was made in good faith based on medical advice and the conservatee's best interests. While acknowledging that "to claim that [a patient's] 'right to choose' survives incompetence is a legal fiction at best," the court reasoned that

13. To clarify matters and place into perspective my objective and the resources to which I looked in deciding what course to follow, my reliance upon the Advance Directive For Health Care Act (Purden's Pa.Leg.Serv., No. 2, 1992) ("Act") is not with judicial blinders to the caveat present in the legislation applying it to "competent" individuals.

Nonetheless, I find that the Act affords "functional guidelines" for the exercise of one's common law right of self-determination via his/her guardian under the standards outlined herein, which I find instructive. The same I believe holds true with the Decedents, Estates and Fiduciaries Code cited infra. Cf. *McConnell v. Beverly Enterprises–Connecticut, Inc.,* 209 Conn. 692, 705, 553 A.2d 596, 603 (1989).

the respect society accords to persons as individuals is not lost upon incompetence and is best preserved by allowing others "to make a decision that reflects [a patient's] interests more closely than would a purely technological decision to do whatever is possible." *Id.,* 200 Cal.App.3d at 208, 245 Cal.Rptr., at 854–855. See also *In re Conservatorship of Torres,* 357 N.W.2d 332 (Minn.1984) (Minnesota court had constitutional and statutory authority to authorize a conservator to order the removal of an incompetent individual's respirator since in patient's best interests).

In *In re Estate of Longeway,* 133 Ill.2d 33 [139 Ill.Dec. 780], 549 N.E.2d 292 (1989), the Supreme Court of Illinois considered whether a 76–year–old woman rendered incompetent from a series of strokes had a right to the discontinuance of artificial nutrition and hydration. Noting that boundaries of a federal right of privacy were uncertain, the court found a right to refuse treatment in the doctrine of informed consent. *Id.,* at 43–45 [139 Ill.Dec. at 37–38], 549 N.E.2d, at 296–297. The court further held that the State Probate Act impliedly authorized a guardian to exercise a ward's right to refuse artificial sustenance in the event that the ward was terminally ill and irreversibly comatose. *Id.,* 45–47 [139 Ill.Dec. at 39], 549 N.E.2d, at 298. Declining to adopt a best interests standard for deciding when it would be appropriate to exercise a ward's right because it "lets another make a determination of a patient's quality for life," the court opted instead for a substituted judgment standard. *Id.,* at 49 [139 Ill.Dec. at 40], 549 N.E.2d at 299. Finding the "expressed intent" standard utilized in *O'Connor, supra,* too rigid, the court noted that other clear and convincing evidence of the patient's intent could be considered. 133 Ill.2d, at 50–51 [139 Ill.Dec. at 41], 549 N.E.2d, at 300. The court also adopted the "consensus opinion [that] treats artificial nutrition and hydration as medical treatment." *Id.,* at 42 [139 Ill.Dec. at 37], 549 N.E.2d, at 296. Cf. *McConnell v. Beverly Enterprises–Connecticut, Inc.,* 209 Conn. 692, 705, 553 A.2d 596, 603 (1989) (right to withdraw artificial nutrition and hydration found in the Connecticut Removal of Life Support Systems Act, which "provid[es]

functional guidelines for the exercise of the common law and constitutional rights of self-determination"; attending physician authorized to remove treatment after finding that patient is in a terminal condition, obtaining consent of family, and considering expressed wishes of patient). [Footnotes omitted]

In the 1992 session, the General Assembly of the Commonwealth of Pennsylvania enacted amendments to Title 20 (Decedents, Estates and Fiduciaries) of the Pennsylvania Consolidated Statutes concerning, *inter alia*, incapacitated persons, the appointment of guardians, their powers, duties and liabilities, and establishing a procedure whereby a person may execute in advance a written declaration indicating to a physician the person's desire to initiate, continue, withhold or withdraw certain life-sustaining medical treatment in the event the person is incompetent and is determined to be in a terminal condition or to be permanently unconscious; further providing for incapacitated persons in terms of statutory scope, of procedure, of appointment of guardians, of guardians' powers, duties and liabilities.[14] See Preamble to Act No. 1992–24 (Purdon's Pa.Leg.Serv., No. 2, 1992).

Enacted during the same session of the General Assembly was Chapter 54, captioned: Advance Directive For Health Care Act (hereinafter "the Act"). *Id.* at § 5401 *et seq.* It has as its purpose the effectuation of the right of all *competent* adults "to control decisions relating to their own medical care" by executing a declaration to that effect. *Id.* at § 5402(a).[15] However, the Act creates no presumption concerning the intent of any person who has not executed a declaration to

**14.** Maryland has recently passed similar legislation: Health Care Decision Act—Life–Sustaining Measures, Chapter 372, H.B. No. 1243, 1993 Regular Session.

**15.** Section 5402 reads:

The general assembly find that all competent adults have a qualified right to control decisions relating to their own medical care. This right is subject to certain interests of society, such as the maintenance of ethical standards in the medical profession and the preservation and protection of human life. Modern medical technological procedures make possible the prolongation of human life beyond natural limits. The application of some procedures to an individual suffering

consent to the use or withholding of life-sustaining procedures in the event of a terminal condition or a state of permanent unconsciousness. *Id.* at § 5402(b). Despite the limitations noted in the Act's reference to "competent" adults, I look to it as a backdrop, along with the case law and treatises on the issue posed for our review. The Act is but one of many elements making up a "functional approach" to my proposed resolution of this particular case.

Further, it must be noted that the Act renders immune from criminal and civil liability any physician or health care provider who participates in determining the course of life-sustaining treatment. *Id.* at §§ 5407(a), 5409(c).

The Act (under Chapter 55, titled: "Incapacitated Persons")[16] recognizes that every individual has unique needs and differing liabilities. Thus, to promote the general welfare of all citizens of the Commonwealth, the Legislature:

> ... *establish[ed] a system which permits incapacitated persons to participate as fully as possible in all decisions which affect them, which assists these persons in meeting the essential requirements for their physical health and safety,* protecting their rights, managing their financial resources and developing or regaining their abilities to the maximum extent possible and which accomplishes these objectives through the use of the least restrictive alternatives; *and recognizing further that when guardianship services are necessary, it is important to facilitate the finding of suitable individuals or entities willing to serve as guardians.*

*Id.* at § 5502 (Emphasis added).

The procedure to be adhered to in assessing one's incapacity is as follows:

> a difficult and uncomfortable process of dying may cause loss of patient dignity and secure only continuation of a precarious and burdensome prolongation of life.

**16.** "Incapacitated person" means an adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable to manage his financial resources or to meet essential requirements for his physical health and safety.

The court, upon petition, and hearing and upon the *presentation of clear and convincing evidence,* may find a person domiciled in the Commonwealth to be *incapacitated and appoint a guardian or guardians of his person* or estate.[17] The petitioner may be any person interested in the alleged incapacitated person's welfare. The court may dismiss a proceeding where it determines that the proceeding has not been instituted to aid or benefit the alleged incapacitated person or that the petition is incomplete or fails to provide sufficient facts to proceed. * * * The The Supreme Court shall establish a uniform citation for this purpose. * * * Personal service shall be made on the alleged incapacitated person, and the contents and terms of the petition shall be explained to the maximum extent possible in language and terms the individual is most likely to understand. * * * [N]otice of the petition and hearing shall be given in such manner as the court shall direct to all persons residing within the Commonwealth who are sui juris and would be entitled to share in the estate of the alleged incapacitated person if he died intestate at that time, to the person if he died intestate at that time, to the person or institution providing residential services to the alleged incapacitated person and to such other parties as the court may direct, including other service providers....

\* \* \*

(e) Petition contents.—The petition ... shall include \* \* \* the specific areas of incapacity over which it is requested that the guardian be assigned powers and the qualifications of the proposed guardian. If a limited or plenary guardian of the estate is sought, the petition shall also include the gross value of the estate and net income from all sources to the extent known.

17. If the Legislature requires that "clear and convincing evidence" is the standard by which a once "competent" person is to be judged "incompetent", *and* to have a guardian appointed of his person or estate, I consider such legislation an evocation of public policy and an indication of legislative purpose as to the approach the courts *may* take in dealing with a patient in a persistent vegetative state.

(f) Who may be appointed guardian.—The court may appoint as guardian any qualified individual.... The court shall not appoint a person ... whose interests conflict with those of the incapacitated.... Any family relationship to such individual shall not, by itself, be considered as an interest adverse to the alleged incapacitated person....

*Id.* at § 5511(a), (e) & (f) (Emphasis added).

In the process of making a determination of incapacity and appointing a guardian, the Orphans' Court *shall* consider and make specific findings of fact covering:

(a) Determination of incapacity.—In all cases, the court shall consider and make specific findings of fact concerning:

(1) The nature of any condition or disability which impairs the individual's capacity to make and communicate decisions.

(2) The extent of the individual's capacity to make and communicate decisions.

(3) The need for guardianship services, if any, in light of such factors as the availability of family, friends and other supports to assist the individual in making decisions and in light of the existence, if any, of *advance directives such as durable powers of attorney or trusts.*

(4) The type of guardian, limited or plenary, of the person or estate needed based on the nature of any condition or disability and the capacity to make and communicate decisions.

(5) The duration of the guardianship.

(6) The court shall prefer limited guardianship.

(b) ...

(c) Plenary guardian of the person.—The court may appoint a plenary guardian of the person only upon a finding that the person is totally incapacitated and in need of plenary guardianship services.

*Id.* at § 5512.1(a), (c) (Emphasis added).

As for the type of evidence needed to conclude one is incapacitated, the Legislature has dictated:

To establish incapacity, the petitioner must present testimony, in person or by deposition from individuals qualified by training and experience in evaluating individuals with incapacities of the type alleged by the petitioner, which establishes the nature and extent of the alleged incapacities and disabilities and the person's mental, emotional and physical condition, adaptive behavior and social skills. The person must also present evidence regarding the services being utilized to meet essential requirements for the alleged incapacitated person's physical health and safety, to manage the person's financial resources or to develop or regain the person's abilities; evidence regarding the types of assistance required by the person and as to why no less restrictive alternatives would be appropriate; and evidence regarding the probability that the extent of the person's incapacities may significantly lessen or change.

*Id.* at § 5518.

In complying with his/her appointed position, it *shall* be the duty of the guardian of the person to assert (and act in regard to) the rights and *best interests* of the incapacitated person. In doing so: "Expressed wishes and preferences of the incapacitated person shall be respected to the greatest possible extent." *Id.* at § 5521. Lastly, unless otherwise specified in the court's order appointing a guardian, the appointee *"shall not have the power and duty to:*

(1) *Consent on behalf of the incapacitated person to an abortion, sterilization, psychosurgery, electro-convulsive therapy or removal of a healthy body organ.*

(2) Prohibit the marriage or consent to the divorce of the incapacitated person.

(3) Consent on behalf of the incapacitated person to the performance of any experimental biomedical or behavioral medical procedure or participation in any biomedical or behavioral experiment.

(e) Knowledge of objection.—In a *hearing to determine whether a guardian shall be ordered to consent to a specific act or omission,* if the guardian knows or has

reason to know of the incapacitated person's objection to the action or omission, whether such objection had been expressed prior to or subsequent to the determination of incapacity, the guardian shall report to the court such knowledge or information.

(f) Powers and duties not granted to guardian.—*The court may not grant to a guardian powers controlled by other statute, including, but not limited to, the power:*

(1) *To admit the incapacitated person to an inpatient psychiatric facility or State center for the mentally retarded.*

(2) To consent, on behalf of the incapacitated person, to the relinquishment of the person's parental rights.

(g) Criminal and civil immunity.—In the absence of gross negligence, recklessness or intentional misconduct, a unit of local government, non-profit corporation or guardianship support agency . . . appointed as a guardian shall not be criminally liable or civilly liable for damages for performing duties as a guardian of the person, as authorized under this chapter.

*Id.* at § 5521(d)–(g) (Emphasis added).[18]

As is clearly evident from Section 5521, where an individual has espoused his or her intentions regarding the use of life-sustaining treatment[19] prior to becoming incapacitated, their

---

**18.** Under Section 3206 of the Act, a person who has been adjudicated incapacitated under 20 Pa.C.S. § 5511, and is pregnant and under the age of 18, shall not have an abortion unless the consent of the parent or guardian is obtained. "In deciding whether to grant such consent, a pregnant woman's parent or guardian *shall consider only their child's or ward's best interests.*"

This aspect of acting in the "best interests" of a ward appears in Sections 4412.2 and 5521 of the Act.

**19.** "Life-sustaining treatment" is defined at Section 5403 of the Act:

Any medical procedure or intervention that, when administered to a qualified patient, will serve only to prolong the process of dying or to maintain the patient in a state of permanent unconsciousness. Life-sustaining treatment shall include nutrition and hydration administered by gastric tube or intravenously or any other artificial or invasive means *if the declaration of the qualified patient so specifically provides.* [Emphasis added]

wishes "shall be respected to the greatest possible extent." Therefore, in those cases where the person has documented or verbalized an intention in respect to life-sustaining treatment in advance of incapacitation, a wish that life-sustaining treatment not be implemented is to be complied with, if possible.[20]

Although courts have had comparatively little difficulty recognizing the existence of a "right to die", there has been substantially more uncertainty about how it should be implemented, especially in the case of patients who lack decision-making capacity. Meisel, *Right to Die,* supra at § 6.1. As the United States Supreme Court remarked, after reviewing a host of cases dealing with discontinuance of artificial nutrition and hydration to an incompetent: "As these cases demonstrate, the common-law doctrine of informed consent is viewed as generally encompassing the right of a competent individual to refuse medical treatment. Beyond that, these cases demonstrate both similarity and diversity in their approaches to decision of what all agree is a perplexing question with unusually strong moral and ethical overtones." *Cruzan,* supra, 497 U.S. at 277, 110 S.Ct. at 2851.

In those instances where there is a lack of a patient's expressed preference, as is the case at bar, *court-defined* criteria come into play in making a treatment decision. See Note, *In re Quinlan Revisited,* supra, 15 Hast. Const.L.Q. at 487.

I take my directive from the Act, out of which a semblance of form and substance can be gleaned in setting perimeters when dealing with an alleged incapacitated person; to-wit:

1) Court involvement may begin with a petition being filed by any person interested in the alleged incapacitated person's welfare, 20 Pa.C.S. §§ 712, 5511(a).

2) Appointment of a guardian of the person may follow, which may include a family member having no adverse interest, 20 Pa.C.S. § 551(e), (f).

**20.** Such is not possible with Fiori because he never demonstrated his intentions, as to medical treatment, if he were to become incapacitated.

3) Assessment of incapacitation is to be made in a court setting and may be augmented by an independent evaluation of incapacity, if deemed appropriate by the court, 20 Pa.C.S. § 5511(a), (d).

4) Notice of the proceeding shall be given to all persons sui juris and entitled to share in the estate of the alleged incapacitated person's intestate estate, and to such other persons the court may direct, 20 Pa.C.S. § 3504.

5) Evidence of incapacity must be by testimony or deposition from individuals qualified to evaluate the individual's incapacity, and evidence is to be elicited as to the likelihood the incapacity may significantly lessen or change, 20 Pa.C.S. § 5518.

6) The level of proof necessary to establish a person's "incapacity" shall be by "clear and convincing" evidence, 20 Pa.C.S. § 5511(a).

7) If the court deems it appropriate to appoint a guardian of the person "[i]t shall be the duty of the guardian to assert the rights and *best interests* of the incapacitated person", with the caveat that the "expressed wishes and preferences" of the incapacitated person shall be followed where possible, 20 Pa.C.S. § 5521.

8) In outlining the powers and duties of a guardian, the court may make provision for the allowance of consent, on behalf of the incapacitated person, to withdraw or withhold "life-sustaining treatment", cf. 20 Pa.C.S. § 5521(d).

9) The conclusion to allow the cessation or denial of "life-sustaining treatment" is to be made by a court,[21] i.e., the

**21.** It has been pointed out by some that the judicial process is cumbersome, inconvenient and interjects significant delays into the decision-making process, such that the rights of the incompetent person are cut short because he/she dies before final adjudication could be obtained. Meisel, *Right to Die*, supra at § 6.9 (Citing cases). Stated another way, the right should be left to the family and physician(s) to make. *Id.* at § 8.6 (Supp.1993) (Citing cases); *In re Browning*, 543 So.2d 258, 261 (Fla.Dist.Ct.App.1989), aff'd 568 So.2d 4 (Fla.1990); *In re Morrison*, 206 Cal.App.3d 304, 253 Cal.Rptr. 530, 535 (1988), citing *In re Jobes*, 108 N.J. 394, 529 A.2d 434, 451 (1987); Note, *In re Storar: The Right to Die and Incompetent Patients*, 43 U.Pitts.L.Rev. 1087, 1104 (1982).

court enters an order allowing the guardian to exercise the incapacitated person's right to refuse the "life-sustaining treatment", where the only purpose served is to prolong the process of dying or to maintain the patient in a state of permanent unconsciousness, 20 Pa.C.S. § 5403.

10) The incapacitated person has been diagnosed as irreversibly comatose or in a persistently vegetative state;

11) The incapacitated person is receiving "life-sustaining treatment" as defined under the Act, 20 Pa.C.S. § 5403.

12) Two physicians, one of whom may be the incapacitated person's attending physician, concur in the diagnosis.[22]

13) The incapacitated person's right outweighs any interests of the Commonwealth, as it normally does, 20 Pa.C.S. § 5402(a), i.e., it is in the incapacitated person's *best interest* to withhold or withdraw "life-sustaining treatment," 20 Pa. C.S. §§ 3206, 5512.1 and 5521.

I would point out that the weight to be given each of the proposed criteria by a court will vary with the particular facts of each case. Cf. *In re Estate of Greenspan*, 137 Ill.2d 1, 146 Ill.Dec. 860, 867, 558 N.E.2d 1194, 1201 (1990). Additionally, because of the inherent sensitive nature of a "right to die" case and the necessarily irrevocable nature of the cessation order, I would allow for appellate review of the instant type of case and permit the broadest scope to the appellate tribunal, with the Court not being bound by any inferences or deduc-

I find that this Commonwealth's avowed preference for life over the cessation of life (as manifested in the Act) takes precedence over the speed-factor in resolving the "right to die" issue. Moreover, although the delays involved in judicial decision making in general are extant, there are statutory and customary procedures available in this Commonwealth for expedited resolution with emergency access to our courts. See Pa.R.App.P. 301(e) and *Cruzan v. Director Missouri Dept. of Health*, 497 U.S. 261, 281, 110 S.Ct. 2841, 2852–53, 111 L.Ed.2d 224 (1990), wherein it was written: "[A] State is entitled to consider that a judicial proceeding to make a determination regarding an incompetent's wishes may very well not be an adversarial one, with the added guarantee of accurate fact finding that the adversary process brings with it." (Citation omitted).

**22.** See, *e.g.*, *In re Estate of Greenspan*, 137 Ill.2d 1, 146 Ill.Dec. 860, 867, 558 N.E.2d 1194, 1201 (1990); *In re Guardianship of Grant*, 109 Wash.2d 545, 747 P.2d 445, 456 (1987).

tions of the lower court. See *In re Terwilliger,* 304 Pa.Super. 553, 450 A.2d 1376 (1982); *Bender v. Bender,* 261 Pa.Super. 12, 395 A.2d 279 (1978)

As this Court did in *In re Terwilliger, supra,* dealing with the standard of proof necessary to authorize the sterilization of an incompetent, I would allow for a quantum of proof necessary to discontinue the sanctity of life to be measured by an equally high level of "clear and convincing" evidence that the "best interests" of the incapacitated person are being served. Society's desire to prolong a life and the medical community's maintenance of ethical standards are factors that go into the equation, each to be given no greater weight than the incapacitated person's "best interests," which, of necessity, requires taking into consideration whether the treatment is "serv[ing] only to prolong the process of dying or to maintain the patient in a state of permanent unconsciousness." 20 Pa.C.S. §§ 5402, 5403. A life devoid of substance and meaning in an irreversibly comatose patient may not be ignored or rendered *de minimus* because of modern medicine's ability to extend life beyond natural limits. *Id.*

Of the basic standards which have evolved for surrogates to decide whether to withdraw or withhold consent to life-sustaining treatment, i.e., "substituted judgment" and the "best interests" standards, see Meisel, *Right to Die,* supra, ch. 9, I would opt for a hybrid "best interests" and "clear and convincing" evidence approach.

Under the substituted judgment standard, the surrogate exercising an incapacitated patient's rights must make the decision whether to forego life-sustaining treatment on the basis of what the patient would have decided had the patient been able to do so. Meisel, *Right to Die,* supra at 278. The perimeters of the standard were concisely set forth in *In re Conroy,* supra, 98 N.J. at 365, 486 A.2d at 1232:

> Under the limited-objective test, life-sustaining treatment may be withheld or withdrawn from a patient in Claire Conroy's situation when there is some trustworthy evidence that the patient would have refused the treatment, and the decision-maker is satisfied that it is clear that the burdens

outweigh the benefits of that life for him. By this we mean that the patient is suffering, and will continue to suffer throughout the expected duration of his life, unavoidable pain, and that the net burdens of his prolonged life (the pain and suffering of his life with the treatment less the amount and duration of pain that the patient would likely experience if the treatment were withdrawn) markedly outweigh any physical pleasure, emotional enjoyment, or intellectual satisfaction that the patient may still be able to derive from life. This limited-objective standard permits the termination of treatment for a patient who had not unequivocally expressed his desires before becoming incompetent, when it is clear that the treatment in question would merely prolong the patient's suffering.

Under the proper circumstances—where a patient was formerly competent—the substituted judgment standard is an appropriate test. *In re Rosebush,* supra, 491 N.W.2d at 639 (Citation omitted). However, as applied to never-competent patients, the substituted judgment standard is inappropriate because it cannot be ascertained what choice the patient would have made if competent. *Id.* (Citations omitted). I would therefore hold that, where the patient has never been competent or has become incompetent without ever expressing a view to terminate life-support efforts, the decision-making test that better guides the guardian is the "best interests" standard, supplemented with the clear and convincing evidence of proof formula. Since the Majority holds to the contrary, I cannot embrace such an approach.

For explanatory purposes, the "best interests" standard was summarized in *In re Guardianship of Grant,* 109 Wash.2d 545, 567–568, 747 P.2d 445 (1987), modified 757 P.2d 534 (1988), as follows:

There will be many situations where it cannot be ascertained what choice the patient would make if competent. In such cases, the guardian must make a good-faith determination of whether the withholding of life sustaining treatment would serve the incompetent patient's best interests. The following is a nonexclusive list of the factors which should be considered in making this determination:

[E]vidence about the patient's present level of physical, sensory, emotional, and cognitive functioning; the degree of physical pain resulting from the medical condition, treatment, and termination of the treatment, respectively; the degree of humiliation, dependence, and loss of dignity probably resulting from the condition and treatment; the life expectancy and prognosis for recovery with and without treatment; the various options; and the risks, side effects, and benefits of each of those options.

In balancing the right of an individual to a dignified existence, without a precarious and burdensome prolongation of life, against the Commonwealth's interest in maintaining human life and ethical standards being preserved in the medical community, I find that a melding of the "best interests" of the patient approach, scrutinized under a clear and convincing evidence standard, achieves the salutary features emblematic of a society that cherishes life and the dignity of human existence. We are a people who acknowledge an individual's right to life, liberty and the pursuit of happiness. *Cruzan,* supra (State has authority to establish a clear and convincing standard in a right to die case, a right which has its roots in the liberty interest of the 14th Amendment of the U.S. Constitution). To achieve this objective, I deem it prudent to have the court involved as a source of dispute-resolution on a question so sensitive as life versus death. As the Missouri Supreme Court has noted on this point:

Autonomy means self law—the ability to decide an issue without reference to or responsibility to any other. It is logically inconsistent to claim that rights which are found lurking in the shadow of the Bill of Rights and which spring from concerns for personal autonomy can be exercised by another absent the most rigid of formalities....

Nor do we believe that the common law right to refuse treatment—founded in personal autonomy—is exercisable by a third party absent formalities. A guardian's power to exercise third party choice arises from the state's authority, not the constitutional rights of the ward. The guardian is the delegatee of the state's *parens patriae* power.

*Cruzan v. Harmon,* supra, 760 S.W.2d at 425 (Citation omitted), aff'd *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990).

First and foremost, my actions are motivated by the desire to preserve life. See *Superintendent of Belchertown v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977). In that capacity, I have examined the facts against the backdrop of the relevant case law and legislation to arrive at a decision authorizing a guardian to withdraw or withhold life-sustaining treatment to an incapacitated person. Such a decision is to be made by a court after a hearing in which "clear and convincing" evidence is forthcoming that it is in the "best interests" of the incapacitated person to cease such life-sustaining treatment. The Majority has chosen an alternate course in reaching the potentially same result, i.e., the cessation of life-sustaining measures for one in an irreversible vegetative state. However, the Majority does not allow for the court's involvement in this most sensitive of issues ("right to life"), especially where the incompetent can neither act nor speak for himself. Therefore, I part company with the Majority and hold, for all the reasons articulated supra, that court participation under the particular facts of this case are consistent with acting in the bests interests of the patient without unduly invading his right to privacy.

With the court's guidance, the genuineness of a guardian's motives may be discovered and not kept secretive since what weighs in the balance is one's life, a valuable and precious commodity which should not be curtailed without proper inquiry as to justification. Toward that end, I espouse an alternate approach to the Majority's position, which I believe better serves the interests of such a patient as Daniel Joseph Fiori in particular and the public in general.[23]

One last observation is that the Majority would allow the fate of patients, such as Fiori, left to the devices of a family

**23.** It is true that Daniel had been receiving nutrition and hydration for 17 years, and he has the prognosis of continuing to do so for up to 10 more years. The longest recorded survival by such means extended life for 37 years. See *Brophy v. New England Sinai Hosp.,* 398 Mass. 417,

member and two physicians to resolve, an issue which even the Majority concedes requires an element of soul-searching and heart-wrenching introspection by the decision-makers as to what will be in the best interest of the patient. Obviously, in that equation is interposed the patient's medical condition and prospects for recuperation, all of which is made in consultation with medical professionals.

Given the course pursued before deciding what choices are most viable, of necessity the interested parties would have gone through a mental and factual checklist consistent with my proposed criteria to be satisfied as a condition precedent to cessation of life-sustaining measures for patients similar to Mr. Fiori. The only additive proposed by this writer is that the discourse occur in a court setting and not in the corridor of some hospital or a doctor's office. To do less would, in my opinion, be a disservice to the patient whose life hangs in the balance.

This disservice is manifested by the Majority's adoption of "a close family member and two qualified physicians" ap-

497 N.E.2d 626, 637 (1986); see also *Guardianship of Doe*, 411 Mass. 512, 583 N.E.2d 1263, 1266 (1992) (10 years); *In re Guardianship of Grant*, 109 Wash.2d 545, 747 P.2d 445, 455 (1987) (8 years); *In re Estate of Greenspan*, 137 Ill.2d 1, 146 Ill.Dec. 860, 862, 558 N.E.2d 1194, 1196 (1990) (17 years then stated to be the record for persistent vegetative state patient on life-support).

While I have not been provided with statistics on the number of patients on life-support systems, in 1983 a presidential commission estimated that at any one time there were approximately 5,000 permanently unconscious patients in the United States. Life-supporting treatment is withdrawn from many such patients. One physician reported to the commission that "between 500 and 1000 patients [at a single university hospital in Pittsburgh, Pennsylvania] have had life-sustaining treatment withdrawn because of permanent loss of the important cortical layers of the brain." *President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life–Sustaining Treatment: A Report on the Ethical, Medical, and Legal Issues in Treatment Decisions* 176–177 & n. 15 (1983); *Conservatorship of Drabick*, 200 Cal.App.3d 185, 245 Cal. Rptr. 840, 847–848 n. 10 (1988).

In this most sensitive of areas, I act with caution. See Steinbeck, *Recovery from Persistent Vegetative State?: the Case of Carrie Coons*, 29 Hastings Center Rptr. 14 (1989); Appellant's Brief at 16 n. 8.

proach as the arbitors of a comatose patient's continued existence, which I believe is flawed by not providing any insight as to the scope and meaning of the phrase. This lack of guidance breeds uncertainty in a society which has undergone a metamorphosis from a tightly knit concentric family unit (which interacted at all levels of familial decision-making) to one of distended families plagued by an unprecedented divorce rate.

Moreover, the deterioration of the family unit has contributed to the creation of a patchwork of single-parent homes, second and third marriages, establishing a step-parent environment and a straining of family bonding among non-blood relatives brought together by re-marriage and alienated by divorce. Such varying scenarios raise the spectra of who takes precedence in a Fiore-type situation: Does a step-parent's decision concerning life or death of a sibling or spouse precede the wishes of a divorced natural parent or spouse? Where both natural parents are deceased, do the wishes of a sibling, aunt, uncle, cousin and/or grandparent take priority where the patient/family member is irreversibly comatose? Is sanguinity to be the sole factor or is it to be looked at in combination with bonding by re-marriage or other lineage factors in deciding the hierarchy of decision-making? Should physicians have a voice in deciding their partner(s) in this life-death process?

In light of the multiplicity of scenarios which surface and remain unanswered by the Majority's piece-meal approach, resolution of which will inevitably require intervention by the courts and is at odds with the Majority's non-court-involvement position, I cannot embrace its application of a formula in a life and death situation which is disingenuous at best and creates more uncertainty than stability in its wake. Therefore, the maelstrom of concern engendered by this most sensitive of issues warrants, in my opinion, the *impartial hand* of the courts to assure that family-member and doctors alike are motivated by interests aimed at benefitting the patient and his/her particular medical condition, and not some expedi-

ent measure far removed from the patient's interest. The checklist of factors set forth supra achieves that objective.

Since the Majority's posturing on this issue advances an alternate approach at odds with my view of court involvement, I respectfully dissent to that portion of the Majority's holding to the contrary.[24]

CAVANAUGH, Judge, dissenting.

The tragic plight of Daniel Joseph Fiori and his mother, Rosemarie Sherman, presents issues which challenge the competence of the judicial process. We are confounded because the issue presented is one where law, metaphysics and theology intersect, thus, overtaxing our poor powers to provide a proper solution.

While I esteem the sensitive and reasoned dispositions espoused by my learned colleagues, I find myself in agreement with the position of the Attorney General of Pennsylvania and would adopt a position which coincides with his.

Which is to say that I would find that the court erred in failing to appoint a guardian ad litem for Mr. Fiori, who, after all, has his continued human existence as the subject matter of

**24.** Albeit not evident in this case, one may not overlook the benefits flowing to a comatose patient's beneficiary under a life insurance policy or whether the heir to a patient's estate is the "close family member" providing input into whether life-support measures should be discontinued. If such be the case, the undercurrent of self-interest must be brought to the fore and scrutinized under a judicial light to evaluate its genuineness. Anything less would be implicit approval of extinguishing a life without judicial concern or intervention to assure the legitimacy of the motives.

Reliance upon the criteria proffered by this writer would advance the best interests of the patient and allow the motive of the "close family member" to be examined without impairing resolution of the issue. One need look no farther than *In re Terwilliger,* 304 Pa.Super. 553, 450 A.2d 1376 (1982) (tubal ligation of mentally incompetent) to confirm such court-supervised intervention serving the best interests of the patient. In fact, since the promulgation of the *Terwilliger* guidelines, adherence to its directions has been appealed only once to this Court, which is silent testament to the feasibility of looking to the courts for a checklist of factors in advance of authorizing invasion of one's privacy. See *In Interest of C.W.,* 433 Pa.Super. 167, 640 A.2d 427 (1994) (en banc). No less concern should be shown to Fiori now.

this litigation. I would hold that this was basic and fundamental error which transcends the strictures of *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974). I would further hold that life sustaining medical care and treatment should not be withdrawn absent clear and convincing evidence of Mr. Fiori's intent to terminate life-sustaining procedures. I would reverse and remand for proceedings consistent with these requirements.