**In the Matter of Julia K. WARREN.**

**Frank J. MURPHY, Public Administrator, Appellant,**

v.

**Dan WHEELER, Guardian ad litem for Julia K. Warren, Respondent.**

**No. WD 46420.**

Missouri Court of Appeals, Western District.

July 13, 1993.

---

Kathleen A. Forsyth, Kansas City, for appellant.

Daniel P. Wheeler, Kansas City, for respondent.

Before SMART, P.J., and SHANGLER and FENNER, JJ.

FENNER, Judge.

Appellant, Frank J. Murphy, Public Administrator of Jackson County, appeals the order of the trial court denying him authority to consent to the withholding of cardiopulmonary resuscitation (CPR) from Julia Warren. Julia Warren is an incapacitated person who is the ward of appellant. Respondent, Dan Wheeler, is the court appointed guardian ad litem for Julia Warren.

At the time of appellant's appointment as guardian for Julia Warren, on March 28, 1991, Ms. Warren was a 73 year old patient at Truman Medical Center West. Ms. Warren was highly susceptible to sepsis and was being treated for urosepsis and respiratory failure. Ms. Warren also suffered from severe arteriosclerosis, coronary artery disease, colitis, chronic anemia, hypothyroidism, and stage III decubitus ulcers. Both of her legs had been amputated above the knee due to severe vascular disease. Her mental state was described by her physician as a persistent vegetative state which had remained constant from at least May of 1991. Prior to her hospitalization Ms. Warren had suffered numerous strokes and had been a bed ridden nursing home patient for several years.

Upon the advice of Ms. Warren's physician, Dr. Ryan, appellant determined that it was in Ms. Warren's best interest that she not be resuscitated in the event of cardiac or pulmonary arrest and petitioned the court for authority to consent to the issuance of a do not resuscitate (DNR) order. Dr. Ryan stated that "[t]he risk of performing CPR is fracturing the xiphoid process which would could (sic) puncture the liver or lungs." Dr. Ryan further stated that Ms. Warren "would not be able to survive CPR." He believed that resuscitation would require that unduly intrusive measures be inflicted upon Ms. Warren. Dr. Ryan believed that a DNR order was in her best interest and stated that all staff at Truman Medical Center West believed that a DNR order should be issued for Ms. Warren.

Additionally, the opinion of a consulting physician, Dr. Stoddard, was received. Dr. Stoddard opined as follows:

I believe a "do not resuscitate" order should be written on the chart because cardiopulmonary resuscitation would not be successful if this patient indeed suffered a cardiac arrest. The reason for this is because the precipitating event for her would most likely be related to sep-

sis. Sepsis in her condition, either urosepsis or secondary to her wound, would present a condition where cardiopulmonary resuscitation has been proven to be unsuccessful. Patients with sepsis do not recover from cardiac arrest despite aggressive CPR. Also, her other debilitating illnesses would further cause CPR to be futile.

The trial court found that Dr. Stoddard's opinion that CPR has proven to be unsuccessful in patients with sepsis was in conflict with expert medical treatises placed in evidence by the guardian ad litem. Further based upon medical treatises in evidence, the trial court determined that "Dr. Stoddard equates 'futility' with 'successful'" and that the expert medical treatises in evidence "indicate that the 'futility' factor is not a legitimate basis for not performing CPR." The trial court determined that the medical professionals in the case at bar were basing their decisions on "quality of life considerations" which are not appropriate under *Cruzan v. Harmon*, 760 S.W.2d 408 (Mo. banc 1988), *aff'd*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). Further relying upon *Cruzan*, the trial court found that there was no evidence of what Ms. Warren's wishes under the circumstances might be and denied appellant's petition for authority to consent to a DNR order.

■ Appellant argues that he has statutory authority to enter a DNR order without court intervention and further that the circumstances of the case at bar are distinguishable from *Cruzan*. We agree on both counts. We believe that a guardian has statutory authority to make medical decisions and consent to medical treatment or the withholding of medical treatment in the best interests of the ward without specific court authorization. Further, we do not find the opinion of the Missouri Supreme Court in *Cruzan*, to the extent that it requires evidence of the wishes of an incapacitated person before withdrawal of artificial hydration and nutrition, controlling in the case at bar.

■ In our review of this court tried case, the judgment of the trial court is to be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We believe that the judgment of the trial court not to allow appellant to consent to a DNR order was against the weight of the evidence and contrary to the law.

Section 475.120, RSMo 1986,[1] addresses the powers and duties of a guardian and provides, in pertinent part, as follows:

> 2. A guardian or limited guardian of an incapacitated person shall *act in the best interest of the ward....*
>
> 3. *The general powers and duties of a guardian of an incapacitated person shall be to ... provide for the ward's care, treatment, habilitation, education, support and maintenance; and the powers and duties shall include, but not be limited to, the following:*
>
> (1) Assure that the ward resides in the best and least restrictive setting reasonably available;
>
> (2) *Assure that the ward receives medical care and other services that are needed;*
>
> (3) *Promote and protect the care, comfort, safety, health, and welfare of the ward;*
>
> (4) *Provide required consents on behalf of the ward;*
>
> (5) *To exercise all powers and discharge all duties necessary or proper to implement the provisions of this section.* (emphasis added).

■ Pursuant to section 475.120, a guardian is empowered and charged to act in the ward's best interest. The guardian is authorized without further court order to consent to medical treatment on behalf of the ward. § 475.120.3(2)–(5). The right to consent to medical treatment necessarily includes the right to withhold consent. In accordance with the statutory authority, the guardian's decision is only reviewable

---

1. All statutory references are to RSMo 1986, unless otherwise specifically stated.

to determine if the guardian acted in the ward's best interest.

■ Given Ms. Warren's overall medical condition and the advice and opinion of her physician, it was within appellant's authority, as guardian, to consent to a DNR order. By denying the guardian's request for authority to consent to a DNR order, the court in essence found that the guardian's opinion that a DNR order should be entered was not in Ms. Warren's best interest. The court made conclusions as to the meaning of the plain language of the opinions of the medical experts involved and relied upon the holding of the Missouri Supreme Court in *Cruzan*.

*Cruzan* is factually and legally distinguishable from the case at bar. In *Cruzan*, the guardians sought a declaratory judgment allowing them to terminate their ward's artificial hydration and nutrition. The Missouri Supreme Court held that, absent clear and convincing evidence of the ward's wishes, a guardian does not have authority to order the withdrawal of artificial nutrition and hydration. *Cruzan*, 760 S.W.2d at 426. The single issue presented in *Cruzan* was, "[m]ay a guardian order that food and water be withheld from an incompetent ward who is in a persistent vegetative state but who is ... not terminally ill?" *Id.* at 412. The court in *Cruzan* reasoned that "common sense tells us that food and water do not treat an illness, they maintain a life." *Id.* at 423. The Supreme Court itself distinguished *Cruzan* from the case at bar by stating:

> [T]his is not a case in which we are asked to let someone die.... This is a case in which we are asked to allow the medical profession to make Nancy die by starvation and dehydration.

*Id.* at 412.

The circumstances of the case at bar call for a determination of appropriate medical treatment for Ms. Warren, a decision within the statutory authority of the guardian which the guardian is obligated to make in the best interest of the ward. Ms. Warren's physician, Dr. Ryan, stated that a DNR order was in Ms. Warren's best interest and that the entire staff of Truman Medical Center West shared that opinion. In Dr. Ryan's opinion, CPR would be unduly intrusive and Ms. Warren would not be able to survive CPR. There was no evidence presented to counter Dr. Ryan's opinion.

There was some medical literature received in evidence discussing the concept of "futility" and the appropriate use of DNR orders. However, this literature did not counter the medical judgment of Ms. Warren's treating physician, Dr. Ryan, as stated in unequivocal terms. The medical articles discuss the fact that futility can have a different meaning to different physicians in different circumstances. The articles further reflect the position of the American Medical Association that a decision to withhold CPR from an incompetent patient should not be made unilaterally by a physician. The American Medical Association takes the position that when a patient is incapable of rendering a decision regarding the use of CPR, a decision may be made by a surrogate decisionmaker based on the previously expressed preferences of the patient or, if such preferences are unknown, in accordance with the patient's best interest.

Under the circumstances of the case at bar, appellant, as guardian on behalf of Ms. Warren, had legal authority as her surrogate decisionmaker. It is against the weight of the evidence to say that appellant was failing to act in Ms. Warren's best interest by desiring to consent to a DNR order.

■ Dr. Ryan was fully advised of Ms. Warren's overall circumstance and medical condition. There was no medical opinion contrary to that of Dr. Ryan upon which the court could base its judgment.[2] The

2. Because Dr. Ryan's medical opinion is sufficient in itself to support consent to a DNR order, it is not necessary to discuss further the trial court's interpretation of Dr. Stoddard's opinion. That is to say that even if the trial court was correct in determining that the medical literature presented was inconsistent with Dr. Stoddard's opinion that CPR has been proven unsuccessful where the precipitating event is related to sepsis, nonetheless, Dr. Ryan's opin-

determination of the trial court that the opinion of Dr. Ryan meant something other than what was clearly stated is against the weight of the evidence. Furthermore, the position of the trial court that evidence of the ward's wishes was necessary before the guardian could consent to a DNR order is contrary to the law.

The judgment of the trial court is reversed.

SHANGLER, J., concurs in majority opinion.

SMART, P.J., files separate concurring opinion.

SMART, Judge, concurring.

A guardian is authorized to consent to medical treatment which is in the best interest of the ward. As a general proposition, a guardian may withhold consent to treatment which is unnecessary or harmful. There are no reported cases in Missouri regarding the legal authority of a guardian to consent to a do-not-resuscitate order. The trial court in this case analyzed *Cruzan v. Harmon,* 760 S.W.2d 408 (Mo. banc 1988) *aff'd* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) to determine whether the principles of that case provide guidance for resolution of the issues presented in this case. The court determined that the broad language of *Cruzan,* its commitment to the protection of patient autonomy, its rejection of "quality of life" considerations,[1] and its presumption in favor of continuing life-sustaining treatment in the absence of an expressed contrary choice of the patient, mandated that it deny authorization for a do-not-resuscitate order in this case.

This is not a case in which Dr. Ryan seeks to withhold nutrition from the patient. Nor is there reason to believe that he seeks permission to terminate the life of the patient. The record suggests that he has conscientiously cared for the patient's welfare.[2] He seeks nothing inconsistent with the principle of Hippocrates: "First, do no harm." His medical judgment, however, suggests that the patient's health is so deteriorated that nothing would be accomplished by emergency CPR in the event of a heart attack, and she would be unlikely to survive CPR.

Our respect for life is not undermined by allowing the guardian to consent to the withholding of CPR in this case. Since there is no medical opinion contrary to Dr. Ryan's, it would be arbitrary to require heroic CPR efforts in the event of a heart attack. The reports which were intended to corroborate Dr. Ryan seemed to be based on considerations which, under *Cruzan,* are to be excluded from the analysis. Although the trial court properly had reservations about the wording of these reports, the reports were corroborative and did not contradict or undermine Dr. Ryan's analysis.

Although I concur in the reversal of the trial court decision, I write separately to emphasize that the authority of court-appointed guardians to consent to DNR orders without court approval is far from unlimited. There must be a sufficient medical basis which is not based on the handicap of the patient, the social utility of the patient's life, or the value of that life to others.

---

ion was sufficient to support consent by the guardian to a DNR order.

**1.** Although pain and suffering are sometimes referred to as involving "quality of life," the concept of "quality of life" which has been held inappropriate for consideration is that which takes into account the "social utility of another's life, or the value of that life to others." *In re Conroy,* 98 N.J. 321, 367, 486 A.2d 1209, 1232–33. Accordingly, the Missouri Supreme Court in *Cruzan* rejected decision making based upon the "diminished capacity" of an incapacitated person. 760 S.W.2d at 422. Similarly, the Missouri Durable Power of Attorney for Health Care Act forbids discrimination against "handicapped and disabled persons" by any health care surrogate appointed pursuant to the act. Section 404.870 RSMo.Supp.1992.

**2.** For instance, Dr. Ryan has avoided subjecting Ms. Warren to the risks of surgery for her decubitus ulcers because of the likelihood that the surgery would kill her. Ordinarily, surgery would be an appropriate procedure for this condition.