In the ESTATE OF Mildred Helena KELTON, Incompetent/Disabled.

Dale Kelton, Petitioner–Appellant,

v.

Helena Gardner and Louise Gardner, Defendants–Respondents.

No. 25930.

Missouri Court of Appeals, Southern District, Division Two.

June 23, 2004.

Motion for Rehearing or Transfer to Supreme Court Denied July 15, 2004.

Scott A. Robbins, Kennedy, Kennedy & Robbins, L.C., Poplar Bluff, for appellant.

William B. Gresham, Poplar Bluff, for respondents.

JOHN E. PARRISH, Judge.

Dale Kelton (petitioner) appeals a judgment of the Probate Division of the Circuit Court of Butler County, Missouri, denying his petition to remove Helena Gardner and Louise Gardner (respondents) as co-guardians of Mildred Helena Kelton and co-conservators of the Estate of Mildred Helena Kelton. This court affirms.

This being a matter tried by the trial court without a jury, appellate review is undertaken pursuant to Rule 84.13(d). As such, the judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Matter of Warren,* 858 S.W.2d 263, 265 (Mo.App.1993).

Petitioner and respondents are the children of Mildred Kelton. At the time of the hearing on the petition that is the

subject of this appeal, Mrs. Kelton was 90 years old and a patient in Mark Twain Caring Center (the care center), a residential care facility. She suffers from dementia and is housed in the Alzheimer unit of the care center. Petitioner alleges that respondents have not assured that Mrs. Kelton is in the best and least restrictive environment and that Mrs. Kelton received medical care; that leaving Mrs. Kelton in the care center has not protected her comfort, safety, and health.

In December 2002, Helena Gardner brought Mrs. Kelton to her home to live. Mrs. Kelton had lived in the same residence in Poplar Bluff, Missouri, for 63 years but could no longer care for herself. Helena Gardner also lives in Poplar Bluff. However, she was unable to provide the care Mrs. Kelton required.

Mrs. Kelton had been placed temporarily in a mental health facility in Sikeston, Missouri. A physician who treated Mrs. Kelton at Sikeston advised placement of Mrs. Kelton in a locked facility. The Alzheimer's unit at the care center is separated from other areas by a locked door. The door will open if someone presses on it for 15 seconds. The care center was selected to provide care for Mrs. Kelton by respondents and Butler County Public Administrator, Sharon Payne. Other facilities were considered; however, Ms. Payne determined the care center best met Mrs. Kelton's needs. Respondents were appointed co-guardians and co-conservators shortly after Mrs. Kelton was placed in the care center.

Petitioner disagreed with the decision to place Mrs. Kelton in the care center. Shortly after Mrs. Kelton was placed there, he visited with her and found her crying. He testified that other patients abused her. He complained about medication she received. The laboratory that marketed certain medicine she was receiving had issued an advisory about possible side effects for patients aged 73 through 97. The medication had been prescribed by Mrs. Kelton's physician. The physician was made aware of the advisory. Mrs. Kelton was taken off the medicine for a period of time. The same medicine was later prescribed for Mrs. Kelton's continued use.

Mrs. Kelton had experienced discomfort from a callous on her foot. Petitioner learned of the problem when visiting his mother. He sought assistance from a nurse. Petitioner testified that the nurse "saw part of the callous that needed to be cut off, and—and did some minor surgery there at that time." At the time of the hearing, Mrs. Kelton was no longer complaining about the callous.

Petitioner told the trial court that Mrs. Kelton had gained 32 pounds since entering the care center; that he was pleased with the weight gain, but had discovered she experienced discomfort because her clothing no longer fit. He complained that larger clothing had not been supplied.

A disagreement between petitioner and Helena Gardner occurred the second time he visited Mrs. Kelton at the care center. Petitioner testified that after that visit he was told by staff at the care center that he was not allowed to see his mother. He said he was also denied telephone contact with her. The restriction was imposed pursuant to a written request made by Helena Gardner. Helena Gardner told the trial court that this occurred after a visit by petitioner had upset Mrs. Kelton; that, "[h]e was—had [Mrs. Kelton] all upset one day. They told me about it. Had me to go down there."

Helena Gardner was asked the following questions and gave the following answers about the written directive denying petitioner contact with Mrs. Kelton:

Q. And my question is, did you instruct the nursing home staff to prepare [the written directive denying petitioner contact with Mrs. Kelton]?

A. No. They came to me and told me that he had her all shook up.

Q. Okay.

A. Three of them came to me and told me.

Q. Okay.

A. And I said, well, I don't know what to do. So she said if you will sign the paper, I can write it up and he— we'll make him leave. So I called Sharon Payne, because I didn't know if I had the authority to do that. And she said if that's happening, sign it. So I signed it.

Petitioner later obtained a restraining order that enjoined Helena Gardner, Louise Gardner "and persons acting in conjunction with them or on their behalf, ... from prohibiting [petitioner] from visiting, communicating or making contact with Mildred Helena Kelton at [the care center] or at any other location where the said Mildred Helena Kelton may be found."

Keith Dale, the director of nursing for the care center, had become acquainted with Mrs. Kelton and with respondents and petitioner. He testified that Mrs. Kelton appeared to enjoy petitioner's visits as well as Helena Gardner's visits; that he did not know how often petitioner visited Mrs. Kelton, but that he had observed Helena Gardner visiting "at least a few times a week" although he knew he did not see her every time she came. He believed he had met Louise Gardner but was not acquainted with her. He thought Louise Gardner had been at the care center on Mrs. Kelton's birthday which he thought had been "within the last month." Mr. Dale was aware that Helena Gardner lived in Poplar Bluff where the care center was located, but that petitioner lived out of state.

Mr. Dale told the trial court he usually saw Mrs. Kelton daily; that she was able to get around by herself. He explained that the ward that Mrs. Kelton was on was "a lock-down ward." He told the trial court, "It is, with a 15–second delay for safety. If she presses on the door for 15 seconds, that door will open." He was asked if Mrs. Kelton had a tendency to roam or wander. He answered that she walked in the hallways. He said Mrs. Kelton participated in social activities at the care center. He explained the type of activities available to her. Mr. Dale said there were no restrictions in Mrs. Kelton's file of which he was aware that would prevent petitioner from taking Mrs. Kelton outside the care center; that petitioner had not asked him that.

Mr. Dale identified Dr. Angela Patterson as Mrs. Kelton's physician. He said Mrs. Kelton took a prescription medication, Risperdal; that Mrs. Kelton came to the care center from a psychiatric unit with Risperdal prescribed. Dr. Patterson had refilled the prescription since Mrs. Kelton had been there. Mr. Dale said petitioner had brought a copy of a notice concerning use of Risperdal to the care center; that it was faxed to Dr. Patterson. After the notice was sent to Dr. Patterson, Mrs. Kelton continued to receive the medication "at Dr. Patterson's prescription." Helena Gardner said Dr. Patterson was aware of the notice concerning Risperdal before Dr. Patterson put Mrs. Kelton back on that medication; that she said the warning was based on "a very small study."

Mrs. Kelton had been seen by a podiatrist, Norman Buckman. Mr. Dale believed Dr. Buckman saw her every other month. Mr. Dale said that any serious medical conditions of any of the care center's patients would be brought to his at-

tention; that Dr. Buckman had not mentioned Mrs. Kelton's callous condition to him although Dr. Buckman did have a progress note in the care center's records. Mr. Dale's staff keeps up with this "on a daily basis."

Mr. Dale was asked if he was aware whether other residents at the care center physically grabbed or abused Mrs. Kelton. He was not. He said that type of problem would be something that would be brought to his attention if it occurred. He was asked about Mrs. Kelton's state of mind and sense of well-being. Mr. Dale said she could forget ten minutes after breakfast that she had eaten; that he had asked her that morning how she was doing and she said everything was okay. He said she had "a big smile on her face"; that she did not appear to be in any distress.

Mr. Dale was asked whether Mrs. Kelton's co-guardians and co-conservators had, to his knowledge, failed to do anything to protect Mrs. Kelton's comfort or safety. He answered, "Not to my knowledge." He had no knowledge of any failure by them to protect her health. He stated he had been able to contact them whenever required to do so.

Helena Gardner told of the search for a facility that was conducted by her and the public administrator before placing Mrs. Kelton at the care center; that the doctor who had treated Mrs. Kelton prior to that time "said she had to be in a lock-down because she would leave." They looked at several other residential care facilities before deciding on the care center. She said Mrs. Kelton would lapse into crying or weeping episodes when she first went to the care center, but she no longer had unexplained episodes of crying. Helena Gardner had not observed other residents at the care center physically interfere with her mother.

Helena Gardner was asked about her mother's weight gain. She said she let pants out and had gotten different pants. She described the foot care that had been provided Mrs. Kelton both before her move to the care center and after. She was asked if Mrs. Kelton still required treatment for the callous on her toe. Helena Gardner said she had "looked at it here the other day and it looked real good." She stated the care center personnel made appointments for Mrs. Kelton to see a podiatrist on a regular basis. Helena Gardner had no concerns about her mother's health at the time of the hearing on petitioner's motion.

The hearing on petitioner's motion was held September 15, 2003. The trial judge took the matter under advisement. Judgment was entered October 6, 2003. The amended motion to remove the co-guardians and co-conservators was denied.

■ Petitioner presents one point on appeal. He contends "[t]he trial court erred in failing to remove Helena [Gardner] and Louise Gardner as the co-guardians and conservators for Mildred Kelton because there was no substantial evidence to support the decision and the decision was against the weight of the evidence in that there was overwhelming evidence that the co-guardians and conservators had failed to discharge their statutory duties, and that by keeping Mildred Kelton in a more restrictive setting than necessary, by not providing her the services needed for her care and comfort, and by denying [petitioner] access to his mother, acted in a capricious and unreasonable manner."

■ "A guardian or conservator may also be removed on the same grounds as is provided in section 473.140, RSMo, for the removal of personal representatives."

§ 475.110.[1] Section 473.140 provides for removal if, among other things, one is "in any manner incapable or unsuitable to execute the trust reposed in him, or fails to discharge his official duties." "[T]he burden of proof is upon him who brings charges of maladministration to make out a prima facie case, and that the burden of proof is not upon the administrator to exonerate himself from such charges." *In re Alexander's Estate,* 360 S.W.2d 92, 98 (Mo. 1962).

This case, unfortunately, arises from a dispute among siblings concerning appropriate care for their mother. Petitioner provided testimony before the trial court regarding his view of what care would best serve Mrs. Kelton. He was displeased that she was in a "lock-down" facility. He stated he observed mistreatment of his mother by other patients; that she needed more individual treatment. He believed this could be achieved by her placement in a less restrictive environment. He found fault with Helena Gardner and Louise Gardner's decision to place Mrs. Kelton in the care center. He was displeased with efforts that had been made to restrict his access to his mother. Petitioner claimed the evidence of these circumstances proved Helena Gardner and Louise Gardner had acted in a capricious and unreasonable manner that warranted their removal as co-guardians and co-conservators.

Helena Gardner and Louise Gardner responded to petitioner's evidence with explanations of why they had taken the actions about which petitioner complained. They inquired of Keith Dale, the director of nursing at the care center, a witness called by petitioner, about the care Mrs. Kelton received and the manner in which she had responded to the treatment that was provided. As in *Estate of Markley,* 922 S.W.2d 87, 95 (Mo.App.1996), "[t]he trial court had the opportunity to judge the credibility of the witnesses and to determine the weight to be given to their testimony." The trial court was free to believe all, part, or none of the testimony of each witness who testified. *Id.*

The trial court was under no obligation to accept or believe the testimony of petitioner that questioned the safety the care center provided Mrs. Kelton or her wellbeing. Petitioner's testimony conflicted with testimony of Mr. Dale and Helena Gardner. The trial court was under no obligation to accept the opinion of petitioner that the constraints imposed by the facility where Mrs. Kelton resided were unwarranted. Mrs. Kelton had been transferred from a mental health facility to the care center on the basis of advice of a physician treating her that she required a "lock-down" facility due to a propensity to walk away.

Petitioner had been subjected to denial of access to his mother for a short time. Helena Gardner offered an explanation of what precipitated that action. The evidence she presented could be construed by the trial court as demonstrating no misconduct by her; that, even if inappropriate, the constraints on petitioner's visits were no longer in place. The evidence was sufficient for the trial court to have concluded the actions taken were not capricious or unreasonable considering the advice Helena Gardner had solicited and received at the time constraints on petitioner's access were imposed.

██ Petitioner asks this court to reassess the trial court's determination of credibility of witnesses. This is not an appellate court's function. "We assume that the trial court believed the testimony and evidence consistent with its judgment. [*Kan-*

1. References to statutes are to RSMo 2000.

*sas City Area Transp. Auth. v. 4550 Main Assocs.*, 893 S.W.2d 861, 866 (Mo.App. 1995).] Consequently, we accept as true the evidence and permissible inferences, which may be drawn favorable to the prevailing party, and disregard the contradictory testimony. *Id." Estate of Markley, supra.* Petitioner's point is denied. The judgment is affirmed.

RAHMEYER, C.J., and SHRUM, J., concur.